**Charles WAIDMANN and Herman Waidmann, Respondents,**

v.

**MERCANTILE TRUST COMPANY NATIONAL ASSOCIATION, Appellant.**

**No. 49296.**

Missouri Court of Appeals, Eastern District, Division Three.

May 13, 1986.

Motion for Rehearing and/or Transfer Denied June 10, 1986.

Application to Transfer Denied July 15, 1986.

Guilfoil, Petzall & Shoemake, Thomas M. Utterback, St. Louis, Samuel C. Ebling, Gallop, Johnson & Neuman, Clayton, for respondents.

Thompson & Mitchell, William G. Guerri, James W. Erwin, St. Louis, for appellant.

SIMON, Judge.

Defendant Mercantile Trust Company National Association (Mercantile) appeals from a judgment of the Circuit Court of the City of St. Louis in favor of plaintiffs, Charles Waidmann in the sum of $111,-772.96 and Herman Waidmann in the sum of $164,180.17 after a remittitur. On appeal, Mercantile alleges the trial court erred in: (1) overruling its motion for directed verdict and judgment notwithstanding the verdict where plaintiffs failed to comply with the terms of the letters of credit; (2) admitting extrinsic evidence and submitting an instruction on the meaning of the term "payment" in the letters of credit where such term was clear and unambiguous; (3) submitting an instruction on waiver and estoppel where Mercantile gave notice and reasons for its refusal to honor the Waidmanns' draws on the letters of credit within a reasonable time and where defects in the draw were incapable of being cured; and (4) submitting verdict directing instructions unsupported by the evidence and not in accord with MAI. In addition, Waidmanns contends that the trial court erred in denying their post trial motion for prejudgment interest where such was capable of determination by a mere mathematical calculation.

A rendition of the facts pertinent to the issues raised on appeal follows. In 1978 Charles and Herman Waidmann began to seek buyers for their lumber yard business, Gerald Lumber Company, in Gerald, Missouri. The Waidmanns, along with their attorney, Daryl Hartley, entered negotiations with W.H. Powell Lumber Company (Powell), a subsidiary of Marian Industries, Inc. (Marian) and Marian's chief financial officer, Walter J. Lutz, Jr.

On October 31, 1978 the Waidmanns and Powell entered into a stock purchase agreement. This agreement provided that Powell would deliver promissory notes, one to Charles Waidmann and one to Herman Waidmann, as consideration for the sale of the Waidmanns' stock in Gerald Lumber Company, a Missouri corporation. The agreement further provided that:

[t]he Notes shall be secured (to the extent of 100% of the declining balance of each Note) by a letter of credit from Mercantile Trust Company, N.A. for an initial period of three years. Thereafter an additional letter of credit for the remaining unpaid balance of the Notes or other security acceptable to the Sellers shall be supplied by Powell to secure the Note; *the failure of Powell to supply such additional letter of credit or other security shall be a default under the Notes.* (emphasis added)

Pursuant to the agreement, Powell delivered installment promissory notes to Charles Waidmann in the sum of $126,-900.00 (payable over 119 months at

$1287.10 per month) and to Herman Waidmann in the sum of $186,400.00 (payable over 119 months at $1890.59 per month). The pertinent terms of each note provide as follows:

This Note and another similar Note of even date herewith have been executed and delivered pursuant to a Stock Purchase Agreement dated October 31, 1978 (the "Agreement"), among Charles Waidmann [Herman Waidmann] the payee and the other stockholder of Gerald Lumber Company. As provided in the Agreement, Powell has the right to offset against the balance of any time remaining unpaid hereunder and against said other Note, the amount of any liability established by judgment against the payee hereof or the payee of said other Note, for breach of any of their covenants, agreements, representations or warranties contained in the Agreement. At the election of the payee or legal holder hereof, the principal sum remaining unpaid hereon, together with accrued interest thereon, shall become due and payable at the place of payment aforesaid in the event *Powell shall default in the payment, when due, of any installment of principal or interest or any portion thereof in accordance with the terms hereof and such* default shall continue for ten days after written notice of default has been delivered to the attention of the president of Powell at 425 North Highway Drive, Fenton, Missouri 62026. (emphasis added)

On September 22, 1978, Lutz, Marian's chief financial officer, went to Mercantile to obtain the letters of credit in accord with the agreement. Mercantile had not participated in the Waidmann-Powell sale negotiations, however Mercantile was informed of the on going transactions by Lutz, as Mercantile was the principal creditor of Marian. After detailing the entire transaction to Mercantile, Lutz was given irrevocable letters of credit which by their terms would expire December 22, 1981. The letters provided, in pertinent part, that:

We hereby authorize you to draw on Mercantile Trust Co., N.A. ...

Available by your drafts at sight accompanied by beneficiary's signed statement certifying that accountee has defaulted in the payment of the respective note and the amount of the draft represents the unpaid principal balance of the respective note.

The maximum amount drawable under letter of credit shall be reduced periodically on a monthly basis in accordance with the schedule attached and a part hereof, reflecting the monthly reduction of principal under each note, accompanied by a signed statement that W.H. Powell Lumber Company, has defaulted in the payment of the respective note and the amount of the draft represents the unpaid principal balance of the respective note.

Drafts must be drawn and negotiated at our office not later than December 22, 1981.

Further, by terms stated therein, the letters of credit were subject to the Uniform Customs and Practice for Documentary Credits (UCP) 1974 Revision, International Chamber of Commerce, Publication No. 290 (all future references shall be to Pub. No. 290, 1974 Revision unless otherwise indicated). Following the closing of the sale, Lutz provided Mercantile with copies of the stock purchase agreement and the promissory notes.

Sometime during 1979 or 1980, the Waidmanns wished to obtain a loan from the Bank of Gerald and went to Mercantile to inquire as to use of the letters of credit as collateral. The Waidmanns testified that they met with Mercantile loan officer Jane McNeil who told them that at the expiration of the letters of credit Mercantile would pay the principal balance due or issue other letters with similar terms. Mark Schaepkoetter, an official of the Bank of Gerald, testified that upon inquiry as to the use of the letters as collateral Jane McNeil told him that Mercantile would pay the balance or issue new letters at the expiration of the first letters of credit. McNeil testified that she had never

met the Waidmanns nor spoken with Schaepkoetter.

In late summer of 1981, Powell was merged with Rimar Building Company (Rimar), also a subsidiary of Marian. Rimar, the surviving corporation, assumed Powell's obligations and continued to pay on the notes. The Waidmanns became concerned with Rimar's ability to secure additional letters of credit because of its financial condition and asked their attorney, Hartley, to check in to the matter. There had been no default in installment payments at this time. Hartley contacted Rimar and received evasive answers as to its ability to obtain additional letters of credit. He also contacted Mercantile, but failed to receive any answer concerning whether it would renew the letters of credit. He said he had the impression Mercantile would not renew the letters. He then called Mercantile to schedule a meeting to discuss what was required to make a draw. The meeting took place on December 21, 1981. The Waidmanns and Hartley met with Maury Matthews and Timothy Conway, Mercantile officers who also handled Marian's account. During the meeting, a dispute arose as to Mercantile's potential liability on the letters which it believed to be $15,-000.00. Mercantile found that it had made an internal error in calculation and its liability was approximately $280,000.00. Hartley testified that Matthews and Conway told him Mercantile would pay what was due under the terms of the letters upon a proper draw. During the course of the meeting the Waidmanns admitted that as yet all installments due had been timely paid. After a discussion of which documents should be presented, Hartley picked up a sight draft and left with the Waidmanns. There was no discussion of the specific language each document should contain to ensure a proper draw.

Hartley drafted the certification of default, had each of the Waidmanns sign his respective documents and then notarized each. Because Charles Waidmann had to travel to Texas to be with an ill member of his family and to get his original amortization schedule, Herman Waidmann went to Mercantile alone on the morning of December 22, 1981 with his and his brother's documents to attempt to draw on the letters of credit. Hartley did not accompany Waidmann because he had business elsewhere. Herman Waidmann met with Conway and Matthews and two Mercantile attorneys, John Sutherland and Richard Zuckerman. Waidmann presented his and his brother's letters of credit, his amortization schedule, two sight drafts representing unpaid principal balance of the notes and two notarized documents stating that accountee had "defaulted pursuant to the terms of said note and stock purchase agreement." Waidmann stated that Rimar had not defaulted in the installment payments but had defaulted by failing to renew or obtain additional letters of credit. Mercantile received the documents and told Waidmann he would receive a reply by mail. Waidmann remained at Mercantile all day while Mercantile officers and lawyers studied the documents, but finally departed after no one would give him any information. On December 24 Richard Zuckerman sent letters to each Waidmann which stated that Mercantile declined to pay on the letters of credit because:

1) Drafts were incomplete as drawer/drawee were incorrectly stated, drafts unsigned and not endorsed.

2) Affidavits of Default and Demand for Payment did not comply with requirements of the letters of credit, it failed to state 'accountee had defaulted in payment of the respective notes'.

3) Bank had reason to believe all payments on notes had been made as due, note not accelerated and no default in payment of the note.

In the reply to Charles Waidmann Mercantile listed the additional reason that his letter of credit was incomplete as submitted in that it lacked the amortization schedule originally attached thereto. Zuckerman returned the original documents to Hartley at his request. Rimar continued to pay on the notes until April, 1982, but never provided additional letters of credit. Shortly after defaulting on the installment

payments, Rimar and its parent company, Marian Industries, Inc., became bankrupt. At that time it owed a principal balance of $111,772.96 to Charles Waidmann and $164,180.17 to Herman Waidmann under the notes.

Waidmanns brought this action against Mercantile for failure to pay on the letters of credit. Prior to the submission of instructions to the jury, both parties agreed that should the jury find for the Waidmanns, the court would order a remittitur to reflect sums paid by Rimar subsequent to the Waidmanns' attempted draws on the letters of credit. It was further agreed and ordered that the issue of prejudgment interest, if necessary, would be handled in post trial motions.

The jury returned a verdict in favor of plaintiffs in the sum of $113,535.01 to Charles and $166,738.42 to Herman. After remittitur, Charles Waidmann was awarded $111,772.96 and Herman Waidmann was awarded $164,180.17.

Subsequently, Waidmanns moved for an award of prejudgment interest from December 22, 1981 to date of jury verdict, August 2, 1984. Mercantile moved for judgment notwithstanding the verdict and new trial. After arguments, the trial court denied all motions.

In point one, Mercantile alleges that the trial court erred in overruling its motions for directed verdict and judgment notwithstanding the verdict where the Waidmanns had admitted that no default in installment payments had occurred and had failed to strictly comply with the terms of the letters of credit. Mercantile also alleges that the trial court erred in giving instructions based upon a substantial compliance standard where the proper standard is strict compliance. Mercantile argues that the letters of credit required certification that a "default in payment of the respective notes" and that plaintiffs' certifications that there had been "default pursuant to the note and stock purchase agreement" did not meet the strict compliance rule for drawing upon the letters, pursuant to the Uniform Customs and Practice for Documentary Credits (UCP). In addition Mercantile argues that because the Waidmanns freely admitted that there was no default in installment payments, a condition precedent to Mercantile's duty to pay had not occurred. Thus, Mercantile concludes the trial court should have sustained its motions. Waidmanns contend that the trial court correctly denied Mercantile's motions for directed verdict and judgment notwithstanding the verdict because a submissible case had been made on the issue of the sufficiency of Waidmann's compliance with the terms and conditions of the letters of credit in the December 22 draw on the credits. Waidmanns contend that their statement certifying default sufficiently complied with the terms of the credit. They allege that provisions of the letters of credit were ambiguous, that the failure to attain additional security constituted a default under the notes and stock purchase agreement and that Mercantile knew that such failure to attain additional security would likely result in attempts to draw on the credits, given that it had been advised of the Powell-Waidmann transactions prior to issuing the letters of credit. Thus they conclude a submissible case on the compliance issue had been made and Mercantile's motions properly denied.

We begin our review with a brief analysis of the letter of credit. A letter of credit is an engagement by a bank or other person made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with conditions specified in the credit. Section 400.5–103(1)a RSMo 1978; *See* UCP General Provisions and Definitions Section b. The letter of credit is the third contract in a complex of three independent contracts. The first contract is between issuer (bank) and its account party and reflects an agreement to issue the letter of credit. The second contract is between the account party and the beneficiary. The third contract, the letter of credit itself, is between the issuer (bank) and the beneficiary, and provides that the issuer (bank) will make payment to the beneficiary upon presenta-

tion of certain documents. *State ex rel. Missouri Highway and Transport Commission v. Morganstein*, 703 S.W.2d 894, 898 (Mo.banc 1986); *Easton Tire Co. v. Farmers & Merchants Bank*, 642 S.W.2d 396, 398 (Mo.App.1982). This third contract is separate and distinct from the contract between beneficiary and account party and is not tied to or dependent upon any underlying transactions.

■ A recent innovation in use of letters of credit is the standby letter of credit in which the issuer agrees to pay the beneficiary upon presentation of documentation indicating that the account party defaulted on a payment obligation. While the standby letter of credit serves a purpose similar to a surety contract, the letter is distinguished in that it creates a primary liability on the original obligation requiring payment upon presentation of the required documents. A surety contract creates a secondary liability on the preexisting obligation of another requiring the surety to pay only if the principal does not. *Morganstein*, 703 S.W.2d at 898.

Here, we are concerned with standby letters of credit. Generally a letter of credit is governed by our commercial code, Sec. 400.5–101 et seq. RSMo 1978 (All future references shall be to RSMo 1978 unless otherwise indicated). However, Section 400.5–102(4) provides that:

(4) *Unless otherwise agreed*, this Article 5 does not apply to a letter of credit or a credit if by its terms or by agreement, course of dealing or usage of trade such letter of credit or credit is subject in whole or in part to the "uniform customs and practice for commercial documentary credits" fixed by the thirteenth or by any subsequent congress of international chamber of commerce. (emphasis added)

Here, each letter of credit specifically provided that "this credit is subject to the Uniform Customs and Practice for Documentary Credits 1974 Revision, International Chamber of Commerce, Brochure No. 290." Our review of the record shows no agreement to the contrary. Thus, the parties are bound by Section 400.5–102(4) to

the strict compliance standard of the UCP. *Morganstein*, 703 S.W.2d at 898; See *Marino Industries v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 115 (2nd Cir.1982); *KMW International v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 15 n. 3 (2nd Cir.1979); N.Y. UCC Section 5–102(4) (McKinney 1964) and the comments therein. Therefore, in determining its obligation to pay, the bank looks solely to the letter of credit and the documents required therein to determine whether the documents trigger the letter of credit, regardless of whether the underlying contract has been performed. Thus, strict compliance with the letter of credit provisions is required. *Morganstein*, 703 S.W.2d at 898, 899.

We are constrained to follow the UCP guidelines in determining whether Mercantile's refusal to pay on the Waidmanns' draw on the letters of credit was justified. The pertinent UCP provisions are as follows:

General Provisions and Definitions

b. For the purposes of such provisions, definitions and articles the expressions "documentary credit(s)" and "credit(s)" used therein mean any arrangement, however named or described, whereby a bank (the issuing bank), acting at the request and in accordance with the instructions of a customer (the applicant for the credit),

i is to make payment to or to the order of a third party (the beneficiary), or is to pay, accept or negotiate bills of exchange (drafts) drawn by the beneficiary, or

ii authorizes such payments to be made or such drafts to be paid, accepted or negotiated by another bank,

against stipulated documents, provided that the terms and conditions of the credit are complied with.

c. Credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts.

B. Liabilities and responsibilities

Article 7

Banks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions of the credit. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in accordance with the terms and conditions of the credit.

Article 8

c. If, upon receipt of the documents, the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, that bank must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

d. The issuing bank shall have a reasonable time to examine the documents and to determine as above whether to make such a claim.

e. If such claim is to be made, notice to that effect, stating the reasons therefor, must, without delay, be given by cable or other expeditious means to the bank from which the documents have been received (the remitting bank) and such notice must state that the documents are being held at the disposal of such bank or are being returned thereto.

f. If the issuing bank fails to hold the documents at the disposal of the remitting bank, or fails to return the documents to such bank, the issuing bank shall be precluded from claiming that the relative payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

In accordance with the provisions of UCP Articles 7 and 8, once the beneficiary presents the letter of credit and the documents called for in the letter of credit, the bank first examines all documents to determine whether they appear on their face to be in accordance with the terms and conditions of the letter of credit. If, after examining the documents, bank considers that the documents are not in accordance with the terms and conditions of the letter of credit, the bank must then determine on the basis of the documents alone whether to claim that payment was not in accordance with the letter of credit. Also in considering the documents, bank considers whether on their face, the documents appear to be inconsistent with one another. If bank finds inconsistencies, the documents will be considered as not appearing to be in accordance with the letters of credit and bank may make such a claim under UCP Article 8(c), (d).

 Here, the letters of credit required the beneficiary to present a sight draft, the letter of credit with schedule attached reflecting the monthly reduction of principal under each note and a signed statement certifying that accountee "has defaulted in payment of the respective note and the amount of the draft represents the unpaid principal balance of the respective note." Herman Waidmann presented his schedule, his and his brother's sight drafts, the letters of credit and his and his brother's signed statement certifying that the accountee "has defaulted pursuant to the terms of said note and stock purchase agreement." The letters of credit require statements certifying that the accountee had defaulted in payment of the respective notes. Thus, the Waidmanns' documents do not appear on their face to be in accordance with the terms and conditions of the letters of credit, in that the certifications require Mercantile to look to another underlying document, the stock purchase agreement, not required by the letters of credit to determine its obligation to pay. Not only would this require Mercantile to consider underlying agreements between Waidmanns and Powell, contrary to UCP General Provisions and Definitions Section c, but it adds a material provision making the certifications not in accord with the terms of the credit. UCP Art. 7, 8(c); *See Mount Prospect State v. Marine Midland Bank*, 459 N.E.2d 979, 982–4 (Ill.App.1983); *Republic National Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109 (TX 1979).

Mercantile, having determined that the documents submitted were not in accordance with the terms and conditions of the letters of credit, was required to determine its obligation based upon the documents alone. If Mercantile considered documents, on their face, to be inconsistent with one another, it could find them not in accord with the terms of the credit and make that claim. UCP Art. 7, 8(c), (d).

The record indicates that Herman Waidmann's statement indicated that a default in payment had occurred. The schedule attached to his letter of credit showed that all payments had been timely made. On their face, the documents appear to be inconsistent with one another. Charles Waidmann's statement also indicated that a default in payment had occurred. At the time his documents were presented December 22, 1981, his letter of credit was not accompanied by the required schedule. Thus a timely presentation of the documents required by the letter of credit was not made, in that not all documents required by the letters of credit had been presented. UCP General Provisions & Definitions Section b. When the schedule was finally received by Mercantile on December 28, 1981, it indicated that all payments had been timely made. The schedule, indicating no default in payments, on its face appears to be inconsistent with Charles Waidmann's statement of default. Mercantile denied payment to Charles Waidmann on December 24 in part because the payment schedule was not attached. Even if the schedule had been attached, as required or Mercantile allowed tardy presentation, pursuant to UCP Articles 7 and 8 Mercantile could properly find the documents inconsistent with one another.

Accordingly, we find the Waidmanns' attempted draws were not effected in accordance with the terms and conditions of the letters of credit. Mercantile could make such claim and be justified in refusing to pay if it did so in a timely manner with adequate explanation of defects. UCP Art. 8, Sections d, e, f. These time and notice issues shall be addressed later in this opinion.

In point two Mercantile alleges that the trial court erred in admitting extraneous evidence as to the meaning of the term "payment" and submitting Instruction No. 8 to the jury where the term is not ambiguous and where the instruction allows the jury to consider underlying agreements, not required by the letters of credit, in determining Mercantile's liability. Instruction No. 8 provides that:

In determining whether or not the defendant had the obligation to perform under the letters of credit set forth in paragraphs First of Instruction Nos. 6 and 7 the jury should consider the following factors:

First, the letters of credit, any extraneous documents referred to in the letters of credit themselves, the relationship of the plaintiffs and defendant, the subject matter of the letters of credit, the facts and circumstances surrounding the issuance of the letters of credit and the practical construction the plaintiffs and defendant placed on the terms of the letters of credit by their words, acts and deeds preceding, attending and subsequent to the issuance of the letters of credit, and

Second, if upon a consideration of the evidence presented to you bearing upon the factors set forth in Paragraph First, you are unable to ascertain the intent of the parties as to the meaning of the terms of the letters of credit, then the court directs you that under the evidence in this case, the terms of the letters of credit are fairly open to more than one construction and you shall take the words of the letters of credit as strongly against defendant as a reasonable reading will justify.

Waidmanns contend that the provision of the letter of credit, concerning "default in payment of the respective note," is ambiguous and construing the letter of credit strictly against its author, Mercantile, and in such a manner reasonably consistent with the intent of the parties, the failure to provide another letter of credit constituted

a default in payment of the notes. We disagree.

■ The letters of credit do not provide for such a default. The reference to the failure to provide another letter of credit as constituting a default is contained in Article 1.4 of the stock purchase agreement. The letters of credit are not concerned with the stock purchase agreement. The notes refer to the stock purchase agreement but do not specifically incorporate the agreement. They merely provide for setoffs by Powell for any breach or incurrence of liability by the Waidmanns. Therefore, reviewing the letters of credit and the documents called for therein, pursuant to the provisions of UCP, General Provisions and Definitions Section c, Mercantile was not obligated to refer to the stock purchase agreement to determine whether a default in payment had occurred. UCP Gen.Prov. & Def. Section b, c; UCP Art. 7, Art. 8. See *Pringle Associated Mortgage Corporation v. Southern National Bank of Hattiesburg,* 571 F.2d 871, 875 (5th C.1978); *Marino,* 686 F.2d 112.

■ Further, we do not find the term "payment" to be ambiguous. Payment means the delivery of money or other valuable thing in the discharge of an obligation or for the purpose of extinguishing a debt. *Allmon v. Allmon,* 306 S.W.2d 651, 655 (Mo.App.1957). The acceptance of a note will not operate as payment in absence of an agreement to that effect between the parties to the transaction. *Griffin v. Priest,* 137 S.W.2d 685 (Mo.App.1940). Here, Powell and the Waidmanns, by the stock purchase agreement, defined default as failure to provide an additional letter of credit or additional security and failure to make timely installment payments. These are separate and distinct events, and either or both constitute default according to the provisions of the stock purchase agreement. The notes are devoid of any terms providing that payment shall mean securing of additional letters of credit. Thus, the acquisition of additional security would not cure a default by failure to pay an installment timely. Accordingly, we find the term "payment" contained in the letters of credit unambiguous. Thus, the admission of the extraneous evidence and the submission of instruction No. 8 was erroneous.

Mercantile also alleges that the trial court erred in submitting verdict directing instructions No. 6 and 7 because the instructions did not properly submit the issues in accord with MAI 26.06 (terms and breach in issue) and 26.07 (when substantial performance sufficient). In accord with our previous finding that no ambiguity exists, and strict compliance is required, we find the submission of the instructions erroneous. See MAI No. 26.06 and 26.07 and Notes on Use.

Mercantile next alleges that the trial court erred in submitting the waiver and estoppel theory and Instructions No. 10 and 11 (not in MAI) to the jury where these were not supported by the evidence. The submitted instructions provide as follows:

INSTRUCTION NO. 10

Your verdict must be for Defendant on the claim of plaintiff Herman Waidmann if you believe:

First, plaintiff Herman Waidmann failed to submit a proper sight draft, or

Second, Plaintiff Herman Waidmann failed to submit a signed statement certifying that W.H. Powell Lumber Company had defaulted in the payment of the note owed to him;

Unless you believe that had defendant identified the claimed deficiencies on December 22, 1981, plaintiff Herman Waidmann could have cured the claimed deficiencies.

INSTRUCTION NO. 11

Your verdict must be for Defendant on the claim of plaintiff Charles Waidmann if you believe:

First, Plaintiff Charles Waidmann failed to submit a proper sight draft, or

Second, Plaintiff Charles Waidmann failed to submit a signed statement certifying that W.H. Powell Lumber company

had defaulted in the payment of the note owed to him;

Unless you believe that had defendant identified the claimed deficiencies on December 22, 1981, plaintiff Charles Waidmann could have cured the claimed deficiencies, or

Unless you believe that the claimed deficiencies could not have been cured by reason that plaintiff Charles Waidmann was not present at defendant's business location because of defendant's actions.

The record indicates that the Waidmanns submitted statements certifying default to Mercantile on December 22, 1981, the last day on which a draw could have been made on the letters of credit. Mercantile took the letters of credit and accompanying documents and told Herman Waidmann that he would receive a response by mail. Mercantile sent letters refusing to pay and the reasons therefor on December 24, 1981, two days after the attempted draw. The trial court submitted the waiver and estoppel issues on the Waidmanns' theory that Mercantile waited an unreasonable length of time to inform the Waidmanns of deficiencies in the certifications of default and thereby prevented Waidmanns from making timely corrections. Mercantile argues that this issue should not have been submitted because a reply was sent within a reasonable period of time after presentment of the letters to it and because the deficiencies stated in explanation of its refusal to pay were incapable of timely correction where no default in payment had occurred.

■ Article 8 of the UCP provides that the issuing bank shall have a reasonable time to examine the documents and to determine its obligation to pay. In the event the bank determines that payment will not be made, it must state the reasons therefor without delay. This is so that the beneficiary has the opportunity to correct the defects so as to comply with the terms and conditions of the letters of credit. What constitutes a reasonable time for taking action depends upon the nature and circumstances of the situation. There is conflicting evidence in the record as to the time when Mercantile decided to refuse to pay. There is testimony that a decision had been reached as early as the afternoon of December 22, 1981 and as late as December 24, 1981. What is clear, however, is that both parties knew the letters of credit would expire at midnight on December 22, 1981 and that time was a crucial factor since any defects capable of correction would have to have been made before midnight. In any event, the threshold question is whether the defects were capable of correction had Mercantile's notification been given timely. The record reveals that a primary defect was the language in the statements concerning default in payment of the notes. These are defects appearing on the face of the documents which could have been corrected readily upon timely notification. The same is true of the defects in the drafts which were incomplete, unsigned and unendorsed. While the drafts and statements of default contained easily correctable errors in drafting, the provisions of the letters of credit also required presentment of the letters with the payment schedules reflecting the monthly reductions of principal to be attached. Only Herman's letter of credit contained the attached schedule. That schedule indicated that there had been no default in the installment payments. As one of the reasons for refusing to pay Charles, Mercantile stated that the letter of credit did not contain the schedule which was to be attached to the letter of credit. When Charles tendered the schedule, it too showed timely payment. The schedules indicate timely payment of the notes, thus no default in payment of the notes, but the Waidmanns' certified statements and sight drafts indicated default in payment of the notes. While the drafting errors were capable of timely correction, the final deficiency cited by Mercantile as justification for refusing to pay could not have been rectified without falsifying the schedules. Thus, while waiver and estoppel may have been applicable to the drafting defects, we find the final reason for Mercantile's refusal to pay was incapable of correction, ab-

sent falsification. Thus, the theories of waiver and estoppel were inapplicable and the submission of the instructions on same is improper.

Based upon our resolution of Mercantile's points on appeal, the issue of prejudgment interest need not be addressed. While we are cognizant of the harsh result of our decision, we are constrained to follow the mandate of the UCP. Accordingly, we reverse and remand with directions to enter judgment notwithstanding the verdict in favor of Mercantile Trust, N.A.

KAROHL, P.J., and GARY M. GAERTNER, J., concur.