**ANCHOR CENTRE PARTNERS, LTD., a Missouri limited partnership, Barton J. Cohen, A. Baron Cass III, Robert L. Swisher, Jr., Robert M. Freeman, Kroh Camelback Associates I Limited Partnership, Kroh Camelback Associates III Limited Partnership, Equity Partnerships Corp., E.A. Financial Corp., and Barton J. Cohen, Byron C. Cohen, Robert J. Shapiro, A. Baron Cass III, Robert L. Swisher, Jr., Patrick F. Healy and Charles M. Herman, as all of the partners of Equity Analysts, a Missouri general partnership, Respondents,**

v.

**MERCANTILE BANK, N.A., Appellant,**

and

**Merchants Bank, a Missouri state-chartered banking association, Respondent.**

**No. 71974.**

Supreme Court of Missouri,
En Banc.

Jan. 9, 1991.

William G. Guerri, W. Stanley Walch, Robert H. Brownlee, Paul J. Puricelli, Peter S. Strassner, St. Louis, for appellant.

Leonard Rose, Susan Linden McGreevy, Martha A. Halvordson, Shelly L. Freeman, Kansas City, for respondents.

Jerome T. Wolf, Terry W. Schackmann, Lauri A. Newton, Kansas City, for amicus curiae Green River Assocs.

John Fox Arnold, Carolyn M. Kopsky, St. Louis, amicus curiae Mo. Bankers Ass'n.

HOLSTEIN, Judge.

The subject of this suit is the enforceability of eight notes payable to Kroh Camelback Associates I (KCA I) and Kroh Camelback Associates III (KCA III) dated November 15, 1984, and two irrevocable standby letters of credit issued by Merchants Bank on June 19, 1986. The notes and letters of credit were given as security for a loan made by Mercantile Bank to Kroh Brothers Development Company (KBDC) evidenced by two promissory notes dated June 20, 1986, and executed by a vice-president of KBDC. KBDC was general partner in KCA I and KCA III. KBDC, a Missouri corporation, is now in bankruptcy.

The plaintiffs include the obligors on the eight 1984 notes and the contingent obligors if the standby letters of credit are drawn upon. The plaintiffs filed suit to be absolved of liability on their notes that were given as part of their capital invest-

ment in the partnerships and to enjoin enforcement of the letters of credit. In addition, they sought money damages. Mercantile counterclaimed to enforce the notes and letters of credit and alternatively claimed the KCA I and KCA III partnerships were unjustly enriched. The trial court entered a declaratory judgment that Mercantile has no right or interest in the notes or letters of credit, and enjoined enforcement of the letters of credit or alternatively awarded the KCA I and KCA III partnerships a judgment of $2,850,000. Plaintiff Equity Analysts (EA) was given a judgment for $10,000 actual and $100,000 punitive damages for an alleged fraud. All other claims and counterclaims were denied.

Merchants appealed the adverse judgment. In an opinion authored by Judge Donald Clark,[1] the Missouri Court of Appeals, Western District, reversed the money judgments for KCA I, KCA III and EA, but affirmed the judgment in all other respects. That opinion was filed June 6, 1989.

On August 1, 1989, this Court decided *Audsley v. Allen*, 774 S.W.2d 142 (Mo. banc 1989). On transfer here an order was entered to retransfer the case to the court of appeals to reconsider its opinion in light of *Audsley*. The court of appeals readopted its opinion and entered a *per curiam* order distinguishing *Audsley* from the present case. Thereafter, this Court again granted transfer. Rule 83.03. Affirmed in part and reversed in part.

## I.  THE ISSUES

The trial court filed extensive findings of fact and conclusions of law with its judgment. Strangely, the points relied on in the appellant's briefs fail to refer this Court to specific erroneous findings of fact or conclusions of law, or a specific aspect of the judgment sought to be reviewed that is unsupported by facts or law. It is indeed puzzling that the rules of briefing are so lightly regarded in a case of this magnitude. The author of the briefs is referred to Rule 84.04(d) and *Thummel v. King*, 570

S.W.2d 679 (Mo. banc 1978). Nevertheless, this Court, as did the court of appeals, will attempt to address what is perceived to be appellant's claims of error by the trial court.

The critical claims running throughout appellant's briefs are (1) the trial court erred in placing the burden on Mercantile to prove that KCA I or KCA III received consideration or a benefit when the 1984 and 1986 loans were made or, alternatively, such burden was met, (2) the trial court's judgment denying enforceability of the eight notes is erroneous because there is insufficient evidence to show Mercantile knew or should have known that KBDC violated a fiduciary duty to the partnership when KBDC pledged partnership assets for the 1986 loan to KBDC, (3) the trial court erred in finding that the letters of credit were not properly assigned to Mercantile Bank, because Mercantile is the named beneficiary, not a mere assignee, and because respondents have no standing or have waived their rights to challenge the letters of credit, (4) the trial court erred in entering a judgment for fraud in favor of EA because the evidence was insufficient to support an essential finding that Mercantile knew its statement that the notes were in default was false. Contrary to appellant's assertions, the standard of review in this court-tried case is that articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). A discussion of these issues requires an extensive statement of facts.

## II.  THE FACTS

In 1983, KBDC, a Missouri corporation, acquired leasehold interest in two office buildings located in the Anchor Centre, Phoenix, Arizona. KBDC formed two limited partnerships under Arizona law to hold the leases, designating them as KCA I and KCA III. KBDC was the general partner in KCA I and KCA III with provisions to admit investors as limited partners.

In 1984, respondent EA became a limited partner in KCA I and KCA III pursuant to an "Amended and Restated Limited Part-

---

**1.**  Much of Judge Clark's opinion is incorporat-       ed, without quotation marks, into this opinion.

nership Agreement," referred to by the parties as the "First Partnerships."

The purpose for entry of EA into the partnerships was to permit it to evaluate the projects as investment vehicles for clients of EA. It was the business of EA to formulate and offer for sale investments in real estate and other ventures to firms and persons with capital available for those purposes. To this end, when a project such as Anchor Centre became available, EA would become a limited partner and if it found the project feasible, it would form a second partnership to which its clients would subscribe. That partnership would then acquire by assignment from EA the latter's limited partnership interest in the first partnership interest that held the investment property. Conversely, if EA decided the project did not offer promise to EA investors, it would withdraw from the first partnership. Initial participation by EA in the first partnership was conditioned upon its right to so withdraw.

In the event EA decided to offer a partnership investment to its clients, the result would be a two tier alignment of interests. The upper tier partnership would consist of the developer as general partner and the lower tier partnership as limited partners. The lower tier partnership would consist of EA as general partner and the individual investors as limited partners. The financing of the partnerships was generally by loans from the partners or from outside sources. Some cash was paid in to the partnership but in limited amounts. Investors usually executed capital notes evidencing obligations to make capital contributions to the partnership. Those notes were used as collateral for partnership loans.

In the present case, the organization of partnerships described above was followed. The details, which the parties agree were not in dispute when the case was presented to the trial court, were these.

When EA entered the KCA I and KCA III partnerships on November 21, 1984, as a limited partner, it gave in exchange for its interests as limited partner noninterest bearing capital notes in the sum of $7,775,000 to KCA I and $1,350,000 to KCA III.

The notes evidenced EA's future obligation to contribute capital to the partnerships. EA also made interim loans to the partnerships of $3,325,000 to KCA I and $1,200,000 to KCA III. Throughout, KBDC was and remained the general partner in KCA I and KCA III with operating and management responsibility.

Early in 1985, EA concluded that KCA I and KCA III did not offer satisfactory potential for investment and decided not to continue its participation. The partnership agreement, the "First Partnerships," included reciprocal options entitling KBDC and EA to withdraw from the partnerships and be restored to the status each held before entering the partnerships. KBDC as general partner accepted the withdrawal of EA and, in accordance with the agreements, caused EA's loans to the partnerships to be repaid. KBDC also assured EA that its obligations on the capital notes were terminated. Thus, to the knowledge of EA, involvement in the KCA I and KCA III first partnerships was at an end. KBDC failed to disclose to EA that in December of 1984 it had pledged EA's capital note of $7,775,000 to Mercantile Bank as security for a loan of $4,450,000, the proceeds of which were deposited by Mercantile in an account in another bank in the name of Kroh Brothers Management Company, a Missouri corporation owned by George P. Kroh and John A. Kroh, Jr. The record is silent as to why distribution was made to that entity or what became of those funds thereafter.

Later in 1985, EA again became interested in the Phoenix office projects. From materials furnished to EA in the course of those discussions, EA first learned that the partnership books showed a loan taken in the name of the partnerships for $4,450,000. EA protested and pointed out that the deficit represented by the obligation was an insurmountable obstacle to marketing partnership investments in KCA I and KCA III. KBDC then informed EA that although KCA I was the nominal maker and obligor on the bank note, the debt was actually that of KBDC. According to EA's witnesses, KBDC informed them that the

$4,450,000 debt was a capital contribution owed to the partnership by KBDC. At this point, EA was still not aware that its capital note had been pledged to Mercantile and had not been cancelled by KBDC when EA withdrew from the first partnerships. Mercantile was also not shown to have been aware at the time when EA withdrew from the first partnerships that the maker of the collateral note it held was no longer a participant in the venture. There was no evidence KBDC took any steps with Mercantile to assume the primary obligation on the $4,450,000 note as it represented to EA it would do.

In December, 1985, EA decided to re-enter the Phoenix office project and Second Amended and Restated Partnership Agreements, referred to as the "Second Partnerships," were signed. Under these agreements, as in the previous partnerships, KBDC was the general partner and EA or its principals were the limited partners. Those principals, respondents Cohen, Cass, Swisher and Freeman, made contributions to KCA I and KCA III in the form of eight capital notes, four each in the amount of $1,555,000 to KCA I and four each in the amount of $275,000 to KCA III. These notes bear the date of November 15, 1984. However, the notes were actually given in December of 1985, coinciding with the organization of the second partnerships.

In preparation for syndication of the venture, EA formed another partnership, Anchor Centre Partners, Ltd. (Anchor Centre). EA was to be the general partner in Anchor Centre, it being contemplated that investors recruited by EA would become limited partners in Anchor Centre. After Anchor Centre was formed, EA principals transferred their limited partnerships in KCA I and KCA III to Anchor Centre and on December 31, 1985, Anchor Centre was admitted as a limited partner in KCA I and KCA III, owning a 98% interest in profits and losses of the KCA partnerships. Anchor Centre also assumed the responsibility to make the contributions due under the eight capital notes previously given to KCA I and KCA III by the EA principals.

As a guarantee for payment of the capital notes, EA, acting as general partner of Anchor Centre, obtained from the Merchants Bank and delivered to KCA I and KCA III two letters of credit. The first was in the amount of $2,720,000 and the second in the amount of $650,000. Anchor Centre was the named beneficiary in each letter of credit, the letters were expressly made transferable and were subject to the provisions of the *Uniform Customs and Practice for Documentary Credits* (1983 revision) publication of the International Chamber of Commerce (UCP).

In 1986, again without notice to or knowledge of the other KCA I and KCA III partners, KBDC made application to Mercantile for other loans. As first submitted to Mercantile, the loans were to be to KCA I and KCA III, but KBDC and Mercantile later agreed that the borrower and recipient of the loan proceeds would be KBDC. The loans were ultimately approved and processed by Mercantile, one in the amount of $6,000,000 and the other for $650,000. As security for the loans, KBDC ostensibly acting as general partner of KCA I and KCA III, endorsed and delivered to Mercantile the eight capital contribution notes of the EA principals evidencing obligations to pay capital into the KCA I and KCA III partnerships. KBDC also purported to assign to Mercantile the two bank letters of credit issued to Anchor Centre by the Merchants Bank.

In disbursing the proceeds of the 1986 loans made to KBDC, Mercantile first paid its loan fees of $22,000. It next paid off the 1984 loans of $4,450,000. Finally, the balance of $2,178,000 was wire transferred to the account of KBDC at another bank. The proceeds from the 1984 loan of $4,450,-000 and the proceeds of the 1986 loans, in excess of those used to pay off the 1984 loan, were paid over by Mercantile either to KBDC or to Kroh Brothers Management Company. The record is silent as to whether KCA I or KCA III benefitted from the proceeds of the loans. The 1984 note for $4,450,000 was returned to KCA I marked paid and the EA capital note for $7,775,000 was also returned. Prior to Mercantile's commitment to making the 1984 and 1986

loans, Mercantile was provided with the KCA I and KCA III partnership agreements.

In December of 1986 or January of 1987, EA and Anchor Centre and the principals in those concerns learned the details of the Mercantile borrowings. At that time, the financial collapse of Kroh Brothers' ventures first came to public notice. Mercantile made demand for payment of the eight capital notes and attempted to draw on the letters of credit through Merchants Bank. Anchor Centre Partners then commenced this suit and a temporary injunction issued to prevent a withdrawal of funds under the letters of credit. Ultimately, the issues were joined upon the second amended petition of Anchor Centre Partners and related persons, partners and corporations, respondents herein, and the answer and counterclaim of Mercantile Bank, appellant herein.

### III. THE BURDEN OF PROOF

■ The parties' briefs and the court of appeals opinion devote substantial attention to the trial court's conclusion that Mercantile had the burden of proving that KCA I or KCA III received consideration or benefit from the 1984 and 1986 loans to Kroh Brothers Development Company. The undisputed evidence was that an officer of KBDC executed promissory notes on behalf of KCA I in 1984 and on behalf of KBDC in 1986. Money was paid or other debts forgiven in exchange for those notes. Mercantile sustained the burden of proving that consideration was given for the 1984 and 1986 loans. *See* § 431.020,[2] and *Moore v. Seabaugh*, 684 S.W.2d 492, 496 (Mo.App. 1984). But that does not resolve the burden of proof issues in this case.

■ The relevant inquiry in determining which party has the burden of proof is to identify who, as is disclosed from the pleadings, asserts the affirmative of an issue. Generally that party has the burden of proof. *Michaelson v. Wolf*, 364 Mo. 356, 261 S.W.2d 918, 924 (1953). The burden of proof never shifts throughout the trial, even though a burden of going forward with evidence may shift if a prima facie

case is made. *Tower Grove Bank and Trust Co. v. Duing*, 346 Mo. 896, 144 S.W.2d 69, 72 (1940). In this case, it is the plaintiffs who allege that the capital notes were unenforceable because Mercantile had knowledge or notice, based upon facts and appearances at hand, that KBDC assigned and endorsed the notes in violation of a fiduciary duty to KCA I and KCA III. The burden of proving the plaintiffs' claim and defenses regarding the enforceability of the capital notes remained with the plaintiffs at all times.

■ Mercantile counterclaimed, alleging that $4,450,000 of the proceeds of the 1986 loan benefitted KCA I and, under a theory of unjust enrichment for money had and received, Mercantile is entitled to judgment against KCA I and KCA III. The essential elements of the bank's claim for unjust enrichment are the receipt and inequitable retention or use of a benefit by KCA I and KCA III. *Third Nat'l Bank of St. Louis v. St. Charles Savings Bank*, 244 Mo. 554, 149 S.W. 495, 502 (1912); *Sturgeon v. State Bank of Fisk*, 616 S.W.2d 578, 582 (Mo.App.1981). Mercantile has the burden of proving the receipt of money or credit by KCA I and KCA III to support its counterclaim.

### IV. THE EIGHT CAPITAL NOTES

■ Plaintiffs' claim that the capital notes are unenforceable is based upon principles of the common law relating to fiduciary duties, partnership law, and on § 456.260. Under § 456.260, a bank is relieved of the duty to inquire to determine that the proceeds of a negotiable instrument payable to a fiduciary are properly applied, unless there is a showing of the bank's actual knowledge of a breach of fiduciary duty or bad faith on the part of the bank. *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 490 (Mo. banc 1980). At the same time, the statute provides that a bank taking a negotiable instrument payable to a fiduciary as security for what the bank knows to be personal debts of the fiduciary is liable to the princi-

---

**2.** Unless otherwise noted, all statutory references are to RSMo 1986.

pal if there is a breach of a fiduciary duty. *Id.* at 493; *Tyler v. Citizens Home Bank of Greenfield,* 670 S.W.2d 954, 957 (Mo. App.1984). In this case, however, the statute is inapplicable because the parties agree that the eight capital notes in question are nonnegotiable instruments.

Mercantile relies heavily on this Court's recent opinion in *Audsley. Audsley* is inapposite. Superficially *Audsley* has similarities. There, a bank was given capital notes made by limited partners to secure personal debts of the general partners. When the general partners defaulted, the bank sued the limited partners on the capital notes. This Court held the bank could recover. In that case, the capital notes in question were not payable to the partnership but to the general partners, as individuals. The notes in *Audsley* were negotiable instruments. The bank in *Audsley* was entitled to the benefits of a "holder in due course" of those instruments under Missouri's version of the Uniform Commercial Code, §§ 400.3–302 and 400.3–303. The factual differences in the ownership and character of the instruments, as well as the legal status of the bank as a holder in due course, distinguish *Audsley* from this case.

■■■■ The rights and liabilities of the parties depend on the statutes relating to partnerships and the common law. As a general rule, a fiduciary relationship exists between partners with respect to partnership transactions. *Michaelson,* 261 S.W.2d at 925; § 358.210. A partner is an agent of the partnership for purposes of its business and the rights and liabilities of a partner to other partners and third parties is largely determined by principles of agency. *Baker v. McCue–Moyle Development Co.,* 695 S.W.2d 906, 911 (Mo.App.1984); § 358.040.3; § 358.090.1. Specific partnership property ordinarily cannot be assigned by a partner to secure personal debts of a partner and attempts to make such assignments are void. *Bates County Nat'l Bank v. Wilson,* 767 S.W.2d 101, 103 (Mo.App. 1989); § 358.090.2; § 358.250.2(2); § 359.090(4) (repealed effective 1–1–89, RSMo Supp.1987). The rules regarding the rights, powers and restrictions of partners are applicable to a general partner in a limited partnership. § 359.090 (now repealed). Those doing business with a partnership are presumed to know the law, even if ignorant of a partnership agreement.

■■■■ The common law rule is that if an agent or fiduciary transfers or assigns property of the principal or the beneficiary to a bank and the bank takes the property in payment of or security for a personal debt of the agent or fiduciary with knowledge, or with notice based upon the appearances and circumstances, that the payor was committing a breach of his duty as agent or fiduciary, the bank is liable to the principal. *Trenton Trust Co.,* 599 S.W.2d at 491; *Tyler,* 670 S.W.2d at 957.

According to plaintiffs, Mercantile had either actual knowledge that KBDC's endorsement and assignment of the capital notes was in breach of a fiduciary obligation or knowledge of such facts and circumstances that the taking of the instrument amounted to bad faith. Plaintiffs point out that the notes were the property of the KCA I and III partnerships and were taken to secure the "personal debt" or for the "personal benefit" of KBDC.

### A. Actual Knowledge

■■■■ The evidence of actual knowledge of a breach of fiduciary duty to which the Court is referred is the partnership agreements. The "second partnerships" agreements and the "first partnerships" agreements each contain almost identical provisions. Mercantile had been provided with those agreements prior to making both the 1984 and the 1986 loans.

The trial court concluded that paragraphs 3.03 and 7.08, read together, empower KBDC to obtain loans "only as provided in the Agreement." The quoted words, or their equivalent, are not found in the agreements. The agreements specifically authorize two types of loan, the "Interim Loan" and the "Permanent Loan." No other loans are mentioned. The trial court found and the parties agree that the 1984 and 1986 loans were not either type.

Apparently, the trial court construed the language of the various provisions to restrict borrowing to the "Interim Loan" and the "Permanent Loan." The construction of written contracts is ordinarily a question of law, not fact. *West v. Jacobs*, 790 S.W.2d 475, 480 (Mo.App.1990). The trial court's construction of the contract, being a legal conclusion, is not binding on appeal.

■ The partnership agreements are not models of clarity. The most that can be said of the provisions of the partnership agreements is that they are ambiguous in describing what loans may or may not be obtained and what security may or may not be given by the general partner. Specifically, the agreement informs third parties dealing with the partnership that they are "entitled to rely conclusively on the power and authority of the General Partner *as set forth in this Agreement*" (emphasis added). At the same time, the agreement informs third parties that they are not "obligated to ascertain that the Agreement has been complied with." Third parties dealing with partnerships should not be held to have actual knowledge of limitations on the authority of a partner when such limitations may only be deduced by applying canons of construction. The agreements do not impart actual knowledge to the reader of those documents that the 1984 or 1986 loans were unauthorized. It is equally true that they do not specifically authorize those loans.

### B. Notice

■ Because the partnership agreements do not impart actual knowledge that the loans were unauthorized, plaintiffs' claim requires proof that partnerships assets were taken as security for a personal debt of KBDC in violation of a fiduciary duty, and that Mercantile, at the time, was put on notice by appearances and circumstances that KBDC was thereby breaching the fiduciary duty. The execution of the notes in 1986 by KBDC is substantial evidence that the loan was a "personal debt" of KBDC. The security given, the eight capital notes, was clearly the property of the KCA I and KCA III partnerships. The proceeds of the 1986 loan were applied first to cancellation of the $4,450,000 partnership debt of KCA I incurred in 1984. However, the balance of the loan proceeds, $2,178,000, was distributed to KBDC. Mercantile argues that its knowledge that $2,178,000 of the loan was paid to KBDC is not sufficient to establish that Mercantile had notice that the giving of the security was a breach of a fiduciary relationship. That was not the only circumstance known to Mercantile.

When the 1986 loan was made, Mercantile sought no explanation nor was one given as to what specific disposition was to be made of the proceeds in excess of the amount paid to cancel the 1984 loan. When the 1986 loan was made, Mercantile was aware that the principal owners of KBDC were becoming financially unsound in their various operations, particularly with regard to the KCA I and KCA III operations. Extensions for payments had been granted on more than one occasion on the 1984 note. Also, the bank was aware that the proceeds of the 1984 loan were not paid to KCA I or KCA III but to another entity which had no known relationship to KCA I or KCA III. Finally, Mercantile had copies of the ambiguous partnership agreements and, at minimum, is presumed to know that a partner, without the agreement of other partners, has no power to assign specific partnership assets as security for personal debts. Taken together, these circumstances were sufficient to prove a breach of a fiduciary duty by KBDC and to put Mercantile on notice that the endorsement and assignment of the eight capital notes amounted to a breach of a fiduciary duty. Given those facts and circumstances, it would take an intentional "closing of the eyes and stopping of the ears" to not recognize what was afoot. *See Trenton Trust Co.*, 599 S.W.2d at 490. The trial court did not err in concluding that the endorsement and assignment of the capital notes was a breach of KBDC's fiduciary duty of which the bank reasonably should have known.

### C. Counterclaim for Unjust Enrichment

■ Mercantile has counterclaimed against KCA I and KCA III, claiming those

partnerships were unjustly enriched by cancellation of the 1984 notes. As previously mentioned, Mercantile had the burden of proving that KCA I and KCA III received a benefit from the cancellation of that note. As a part of the burden of proof on the unjust enrichment count, it was necessary to show that the KCA I and KCA III partnerships were obligated to repay the note. Because the partnership agreement was ambiguous as to whether the 1984 loan was authorized, the question became whether KBDC had apparent authority to obtain the 1984 loan. The burden was on Mercantile to show that KBDC's act was "apparently for the carrying on of the partnership in the usual way," or the partnership was not obligated. § 358.090.2. The fact that Mercantile was aware that the 1984 loan proceeds were paid to an entity having no known relationship to KCA I or KCA III and the absence of evidence showing that the proceeds of the 1984 loan were used to carry on any partnership business justified a conclusion that the KCA I and KCA III partnerships were not obligated on the 1984 loan. Therefore, they were not shown to have received a benefit by the cancellation of the° 1984 instruments. Thus, no error was committed in denying Mercantile's claim for unjust enrichment.

## V. LETTERS OF CREDIT

One of the major issues in the case is whether Mercantile was entitled to draw on the two letters of credit issued by Merchants Bank and purportedly held by Mercantile as assignee. The facts relevant to the letters of credit will be restated as a prelude to discussing the points of error raised by Mercantile in its challenge to the trial court's judgment.

When the second partnership agreements for KCA I and KCA III were consummated in preparation for syndication, Anchor Centre, an entity formed by EA, was admitted as partner. Previously, the four EA principals, Cohen, Cass, Swisher and Freeman, had been limited partners in KCA I and KCA III. Anchor Centre was substituted in their place. Anchor Centre, with EA as its general partner, also assumed responsibility to pay the eight capital contribution notes which Cohen, Cass, Swisher and Freeman had given KCA I and KCA III for their limited partnership interest. It was customary in real estate ventures such as the Anchor Centre project for investors to furnish security to guarantee payment of capital contribution notes. In the case here, arrangements were made for Merchants Bank to issue letters of credit in the total amount of $3,370,000 as security for payment of the eight capital contribution notes assumed by Anchor Centre when it entered the two KCA partnerships. These letters of credit, procured by EA Financial Corporation, an entity held by the EA partners, were, however, issued to Anchor Centre giving that partnership the right to draw on the credit. Thus, EA Financial Corporation was the "account party" and Anchor Centre was the "beneficiary" of the letters. They were issued by Merchants Bank on June 19, 1986.

The letters of credit entitled the beneficiary to draw up to the stated sum upon presentation of the letters and a "Demand For Payment" which was required to affirm that the capital notes were overdue. Also included were provisions for assignment of the letters and an agreement that the terms of the letters were made subject to the UCP.

At the request of EA, Merchants Bank amended the letters of credit changing the beneficiary to KCA I in one of the letters and KCA III in the other. Thereafter, Merchants Bank successively amended the letters changing the beneficiary first to KBDC and finally to Mercantile. On March 9, 1987, after KBDC had defaulted in repayment of its notes given to Mercantile for the 1986 loans, Mercantile undertook to draw on the letters of credit. Institution of this suit prevented the draw from being honored by Merchants Bank.

■ The trial court found that the letters of credit had not been validly transferred to Mercantile and that the demand for payment had not been in proper form. We consider first the grounds upon which the trial court reached this result.

The UCP, to which the terms of the present letters of credit were made subject, provides in part as follows:

**Art. 54(a)**

A transferable credit is a credit under which the beneficiary has the right to request the bank called upon to effect payment or acceptance or any bank entitled to effect negotiation to make the credit available in whole or in part to one or more other parties (second beneficiaries).

**Art. 54(e)**

A transferable credit can be transferred once only. Fractions of a transferable credit (not exceeding in the aggregate the amount of the credit) can be transferred separately, * * * and the aggregate of such transfers will be considered as constituting only one transfer of the credit. The credit can be transferred only on the terms and conditions specified in the original credit * * *.

Under the above provisions of the UCP, the letters of credit could not have been transferred to Mercantile and Mercantile could not acquire the status of a beneficiary entitled to draw on the credits because the right to transfer was exhausted once the first transfers were made to KCA I and KCA III from the first beneficiary, Anchor Centre. At most, the only rights Mercantile received were as an assignee from KBDC limited to such rights as KBDC may have had to the proceeds of the credits.

■ In the case of letters of credit, this distinction between transferee and assignee is significant. Under UCP, Art. 54(a), a transferee is one who is substituted for the original beneficiary and succeeds to all rights to draw on the credits. An assignee, in contrast, acquires only an interest in the proceeds of the credits when drawn by the beneficiary. Here, the interest Mercantile had in the credits was dependent on the interest of its assignor, KBDC, which was itself merely an assignee under the second purported transfer. Irrespective of questions as to whether KBDC has any rights to assign, Mercantile as an assignee ac-

quired no right to draw on the credits from Merchants Bank. That right was confined to the first transferee under the UCP.

The evidence in the case also disclosed two additional defects in the purported transfer of the letters of credit to Mercantile. The letters themselves included the following provision:

This letter of credit may be assigned by you [the first beneficiary], effective only upon receipt by us [the bank] of the Assignment in the form attached hereto as Annex B, properly executed and accompanied by the Original Letter of Credit, for endorsement of the transfer.

It was undisputed that the purported assignments to KBDC and by it to Mercantile were not endorsed on the letters at the time the assignments were made because the original letters of credit were not presented for endorsement as the letters required.

An added defect lies in the fact, also undisputed, that the original beneficiary of the letters, Anchor Centre, never executed an assignment of the letters to anyone.

Mercantile complains that the above listed defects barring it from acquisition of transferee status and the right to draw on the letters of credit amount to no more than a "technical defense" which is somehow less meritorious. The answer to that contention lies in the nature of letters of credit which exposes the "account party" to significant risk.

■ A letter of credit is independent of the contracts which comprise it and ordinarily no default of the underlying transaction is necessary to trigger the obligation of the bank to pay under the letter. *State ex rel. Mo. Highway and Transp. Comm'n v. Morganstein*, 703 S.W.2d 894, 898 (Mo. banc 1986). In the case of a "standby letter of credit," the circumstance here, the credit becomes available to the beneficiary upon the occurrence of a stated event which may be a failure in performance of a subordinate obligation. Even then, however, the bank is required to look only to the documentation before it, the letters of credit and supporting statements, to deter-

mine whether the conditions of the letter have been met. *Waidmann v. Mercantile Trust Co. Nat'l Ass'n,* 711 S.W.2d 907, 913 (Mo.App.1986); UCP Art. 16(a). A letter of credit therefore grants to the beneficiary a broad power to draw on the account party's funds and a corresponding opportunity for abuse.

The risk an account party takes when placing in the hands of the beneficiary the rights under a letter of credit are counterbalanced by the obligation on the beneficiary and the bank to comply strictly with the terms of the letter and any incorporated protocol such as the UCP or the Uniform Commercial Code. Of necessity, noncompliance by a party with the conditions of a letter of credit will in most cases be a technical defect. That fact, however, does not excuse compliance and does not confer rights otherwise not accruing.

■ Mercantile next argues that respondents lack standing to contest the right of Mercantile to draw on the letters of credit and to raise the objection that Mercantile is not a beneficiary to the letters. It bases this contention on the fact that a letter of credit is a two party agreement between the bank and the beneficiary, citing *Waidmann v. Mercantile Trust Co. National Association,* 711 S.W.2d 907 (Mo.App.1986), and any contest is a matter only between the Merchants Bank and Mercantile.

If the situation were one in which respondents were challenging Mercantile's representation to Merchants Bank that the capital notes were past due, the contention would be valid. In that case, Merchants Bank is concerned only with the documentation presented for the draw on the credits and not with a subordinate dispute between respondents and Mercantile. Here, however, the account party and the first beneficiary seek to forestall payment on the credit because Mercantile is not the beneficiary of the letters and has no right to draw on the credit. In this circumstance, respondents unquestionably have standing to seek a judicial determination, both as to Merchants Bank and Mercantile, over disposition of the credits before payment. Mer-

cantile's claim that the subject of its beneficiary status was beyond the scope of this suit is rejected.

■ Next, Mercantile observes that Merchants Bank, as the issuer of the letters of credit, was entitled to name any beneficiary it chose and when it designated Mercantile the beneficiary of the letters of credit in this case, Merchants Bank was obligated to honor Mercantile's draw on the credits. According to this approach, Mercantile suggests that Merchants Bank may not refuse to honor Mercantile's claim under the letters because it was Merchant's own act which transferred the letters to Mercantile.

The contention indulges and is dependent on the incorrect assumption that when Merchants Bank received the assignment and amended the letters of credit to name Mercantile, it thereby became the beneficiary of the letters. As the previous discussion in this opinion has demonstrated, the letters of credit were transferable only once and no unilateral act by Merchants Bank could alter that limitation. Such transfer of the letters as was made could create and only did create in Mercantile the rights of an assignee.

It is to be observed that the amendments made by Merchants Bank to the letters of credit (Amendments No. 3) included the following: "hereby amends the Letter of Credit to provide that the beneficiary thereunder shall be Mercantile Bank National Association." That language suggests Merchants Bank was attempting to do that which the agreement of the letters prohibited, a third transfer of beneficiary rights. If such was the intended effect, it was inoperative as to respondents and created no transfer of beneficiary status under the subject letters upon which Mercantile bases its claims. The transaction may be contended to create a cause of action between Mercantile and Merchants Bank, but that is not this suit and Mercantile has pleaded no case under that theory. No opinion is expressed on the merits of such a claim.

■ Mercantile presents other arguments in support of its right to draw on the

letters of credit including theories of waiver and estoppel based on the fact that respondents were aware of the assignments of the letters of credit when they were made. There was conflicting evidence on the questions of what deceptive conduct was practiced by Kroh entities in these transactions and the extent of the information respondents received. The proof was insufficient to show that respondents intentionally waived any known rights they had to protest the invalid transfers of beneficiary interest in the letters of credit. Other arguments Mercantile raises have been considered and found to be without merit.

## VI. THE AWARD OF ACTUAL AND PUNITIVE DAMAGES FOR FRAUD

■ The trial court awarded $10,000 in actual damages and $100,000 in punitive damages against Mercantile and in favor of EA Financial Corporation on the latter's claim that Mercantile's conduct when it attempted to draw on the letters of credit was fraudulent. Mercantile contends that judgment should be reversed for want of proof of the essential elements of the claim.

In their petition below, respondents alleged that on March 9, 1987, Mercantile undertook to present to Merchants Bank the documentation necessary to withdraw the credits under the two letters of credit Mercantile held, purportedly as transferee from KBDC. That action prompted respondents to seek the temporary restraining order, which the trial court ultimately converted into a permanent injunction, precluding Merchants Bank from paying out on the letters of credit. The actual damages to EA Financial Corporation were associated with fees and expenses incurred in obtaining the restraining order.

Respondents contended, and the trial court found, that Mercantile's conduct with respect to the letters of credit was fraudulent. Without exploring all the elements of a fraud claim, it suffices to say that respondents alleged Mercantile's conduct to have been fraudulent because Mercantile was fully aware prior to March 9, 1987, of respondents' claims that Mercantile was not a transferee of the letters of credit, that KCA I and KCA III owed nothing to KBDC and hence the capital notes represented no liability as regarded a KBDC debt to Mercantile, and that any obligation owed KCA I and KCA III had been satisfied by payment of the notes to the partnerships. According to respondents, that information placed Mercantile on notice that a representation to Merchants Bank regarding overdue status of the capital notes, a condition to making a draw on the letters of credit, would be false.

■ Among the elements of an action for fraud are, (1) a false, material representation, and (2) the speaker's knowledge of its falsity or his ignorance of its truth. *Gast v. Ebert,* 739 S.W.2d 545, 547 (Mo. banc 1987). The evidence in this case established that Mercantile's officer represented to the Merchants Bank that the debt on the capital notes was overdue. That representation was not made with the hindsight enhanced by the research subsequently made into the complexity of the transactions this opinion has explored, nor with the benefit of this opinion.

At the time, Mercantile knew it held the letters of credit with amendments designating it beneficiary. It also had the capital notes on which payment had been demanded of the makers before any payments were made by them to KCA I and KCA III. Finally, it had disbursed loan proceeds in 1984 and 1986 without receiving any repayment. Virtually any hope of recovering any amounts from KBDC had ended.

As this opinion has demonstrated, the complexities of the subject transactions have raised a number of intricate questions going ultimately to the decision of who bears the loss attributable to the failed Kroh Brothers ventures. Mercantile did act imprudently and contrary to good banking practice in many respects. The evidence does not, however, show that Mercantile knew its representations made to draw on the letters of credit were false, but rather that an arguable case could be made for indemnification. There was no proof of intent to deceive. The dispute could be and was legitimately entertained over rights to the credits. For this reason, the trial court improperly found for respondents on the

fraud claim and allowed damages. This conclusion obviates the necessity to pursue other defects Mercantile asserts in respondents' fraud count.

## VII. THE $2,850,000 JUDGMENT AGAINST MERCANTILE

Finally we consider, *sua sponte*, and in the interests of judicial economy the matter of the "alternative" judgment entered by the trial court against Mercantile. That judgment in favor of KCA I and KCA III was for $2,850,000.[3] The judgment was stated to be effective only in the event, contrary to the earlier finding by the court, that Mercantile prevail in its efforts to collect payment on the capital notes. The court's stated purpose in entering the judgment was to cause Mercantile to refund to the partnerships any sums collected on the partnership notes.

This opinion affirms the judgment denying Mercantile any interest in the capital notes and the letters of credit, thereby rendering the alternate judgment unnecessary and surplus. It is to be observed, however, that the alternate judgment failed to take account of the fact that on March 2, 1987, before judgment in this case was entered, Anchor Centre on behalf of the limited partners paid into KCA I and KCA III the stated amounts of the capital notes. Thus, KCA I and KCA III would suffer no loss or damage if the makers of the capital notes were again held liable. If any consequence flowed from that event, the loss would be upon the limited partners who caused the payments to be made to KCA I and KCA III with notice that Mercantile claimed rights to payment of the notes.

The alternate judgment against Mercantile serves no purpose in this case but could be a source of future question of potential Mercantile liability. That judgment should therefore be reversed.

## VIII. CONCLUSIONS

For the reasons stated, the judgment declaring Mercantile Bank to have no interest in the capital notes and permanently enjoining Merchants Bank from honoring any demand for payment by Mercantile Bank of credits under the letters of credit is affirmed. The judgments awarding KCA I and KCA III the sum of $2,850,000 against Mercantile and awarding EA Financial Corporation the sum of $10,000 actual damages and $100,000 punitive damages against Mercantile are reversed. The judgment that Mercantile take nothing by its counterclaims is affirmed. Refund to respondents of their deposit of $385,000 with the Court Administrator is ordered. Costs assessed against Mercantile.

BLACKMAR, C.J., ROBERTSON, RENDLEN, HIGGINS and COVINGTON, JJ., and SHRUM, Special Judge, concur.

BILLINGS, J., not sitting.

---

**3.** Because the parties make no reference in their briefs to this alternative judgment, there is no explanation provided as to how the amount was calculated. No ready basis appears to relate this sum to any amounts of the Mercantile loans. Perhaps by coincidence, the sum is approximately the amount of the eight capital notes less the principal sum of the 1984 Mercantile loan ($7,320,000 minus $4,450,000).