**Charles W. ROOTES, Respondent,**

v.

**RIVAL HOLDINGS, INC., Appellant.**

**No. WD 45075.**

Missouri Court of Appeals,
Western District.

July 21, 1992.

Michael W. Lerner, Overland Park, Kan., Ace E. Rowley, Kansas City, for appellant.

John P. Ryan, Jr., Grandview, for respondent.

Before HANNA, P.J., and FENNER and ULRICH, JJ.

HANNA, Presiding Judge.

This appeal concerns a claimed breach of a written contract and its interpretation. There are no disputed factual issues. The trial court found in favor of Mr. Rootes, ordered the appellant-employer to pay him back retirement benefits, and set the amount of benefits to be paid in the future.

In April 1986, appellant, Rival Holdings, Inc. ("Rival") was in the process of acquiring Rival Manufacturing Company, which was in the business of manufacturing and selling small kitchen and household appliances. At that time, Mr. Rootes was president and chairman of the board of Rival Manufacturing Company. He was 58 years old and had been employed by Rival Manufacturing Company since 1963.

In connection with the acquisition, Rival offered Mr. Rootes employment under terms which were set out in a letter agreement (the "Agreement") and additionally, the Agreement contained certain provisions relating to his early retirement benefits. This Agreement was executed April 4, 1986, and is the contract in issue.

The Agreement provided that if Mr. Rootes' employment terminated prior to his normal retirement date at age 65, he was to receive two types of monthly payments. He was entitled to receive early retirement benefits under the provisions of Rival's retirement plan (the "plan"), and a second monthly payment from an annuity which would be purchased by Rival after his termination.

The amount of the annuity payments was to be computed pursuant to a procedure set out in the Agreement. The critical sentence of the Agreement relating to the computation reads as follows:

"In the event that, prior to your reaching age 65, your employment shall be terminated ... you shall be entitled to receive early retirements payments under Rival's Revised Retirement Plan ... [and] Rival shall purchase a life annuity in your name from an insurance company reasonably acceptable to you, *providing a benefit which amounts to the difference between the pension benefits which you are then entitled to receive under the Plan and those which you would have been entitled to receive under the Plan ... had your employment been terminated on your normal retirement date under the Plan (calculated on the assumption that your total compensation for the last full year of employment prior to termination, or for the year in which your employment terminated (using your base salary at an annualized rate and including any bonus or incentive compensation paid with respect to such year), whichever is greater, would have increased at each calendar year-end thereafter, through the December 31st prior to your 65th birthday, at the rate of ten percent (10%) per annum).*" [Emphasis added].

Respondent's employment terminated on or about June 1, 1988. He was 61 years old. At that time, Rival calculated Mr. Rootes' reduced early retirement benefits under the plan and the monthly payments to be made under the annuity. The "plan" payments were to be made by State Mutual Life Assurance Company, the administrator of the plan, and the provisions under the plan are not in dispute. The annuity payment was in addition to the plan's retirement benefit payments. The annuity calculation was presented to Mr. Rootes, in writing, with an explanation. Rival initially offered to make such payments out of the corporate operating revenues, but Mr. Rootes insisted that an annuity be purchased to fund the payments. Rival submitted an application to Mr. Rootes for approval of the annuity and he approved it. Rival purchased an annuity from the Manufacturer's Life Insurance Company.

An integral part of the Agreement is § 415 of the Internal Revenue Code (the "IRC limit").[1] Section 13.11 of the plan parrots the language of § 415. The IRC limit was incorporated into the plan in order to assure the plan qualified for certain federal tax treatment. When Mr. Rootes terminated his employment, his retirement benefits under the plan were restricted by an annual benefit limitation set out in § 13.11 of the plan. Mr. Rootes acknowledged the IRC limit placed a cap on his total benefits payable under the plan.

Each year since 1988, the U.S. Secretary of the Treasury has adjusted the IRC limit upward. This increase is expressed as a "cost-of-living adjustment" as provided by § 415(d). Subsection (d) of § 415 mandates annual adjustments to the limit imposed by § 415(b), and Rival was aware the adjustments would apply to Mr. Rootes' retirement payments since they were specifically referred to in § 13.11(b) of the plan.

Both parties agree that $8,837.98 per month is a correct computation of the retirement benefits Mr. Rootes would have received if he had continued his employment to his normal retirement date at age 65. However, the IRC limit placed a cap on Mr. Rootes retirement income for each year except 1991, at which time the IRC limit was permanently raised above the $8,837.98 figure. This IRC limit in 1988 was set at $94,023.00, or $7,835.25 per month.

In early February 1989, Mr. Rootes requested Rival to increase his monthly benefit payments by an additional $1,002.73 per month under the annuity, effective from the date of his termination. This would have increased his monthly retirement payment from $7,835.25 to $8,837.98. Mr. Rootes claimed the express terms of the Agreement contemplated the increases provided by § 415(d), that the limitation which existed in 1988 became inapplicable, and that the amount paid monthly under the annuity should have been increased.

On August 4, 1989, after Rival refused to pay the increases, Mr. Rootes filed his breach of contract action in the Circuit Court of Jackson County seeking damages of $1,002.73 per month from July 1, 1988, and such additional amounts as became due prior to judgment. Rival contended the only calculation it was required to make with respect to the annuity was in 1988, at the time when it purchased the annuity and when the employee was terminated. Rival argues that without knowing how much the future assessments would be, it was impossible to calculate any annuity amount other than the one in 1988. It is Rival's position that the amount calculated in 1988 was the amount to be paid from that point on. Rival reasons that requiring it to recompute and pay additional amounts each year according to the increases in the IRC limit adds extraneous language to the Agreement.

The trial court ruled in favor of Mr. Rootes and awarded damages to him in the amount of $1,002.76 for the 35 months prior to judgment, plus pre-judgment interest, and also ordered Rival to pay respondent an additional $1,002.76 per month for the remainder of his life, effective July 1, 1991.[2] The trial court found the following: that Mr. Rootes was entitled to receive $8,837.98 per month, an amount he would have been entitled to receive under the plan had his employment been terminated on his normal retirement date; that respondent's total monthly retirement benefits under the plan were restricted to $7,835.25 in 1988 because of the IRC limit that year and as of January 1, 1991, the IRC limit no longer restricted the respondent's monthly retirement benefit amount of $8,837.98.

The court initially concluded the IRC limit applied only to the payments made under the plan and not to payments made from the annuity and therefore, respondent was entitled to the full amount of $1,002.76 per month from the date of Mr. Rootes' retire-

---

1. All statutory references are to Title 26 of the United States Code Annotated (the Internal Revenue Code), unless otherwise indicated.

2. There is a slight discrepancy in the calculations which does not affect the substance of our decision. The discrepancy only concerns whether the figure was $1,002.76 or $1,002.73, a difference of 3 cents per month.

ment and that it should be paid through an annuity. Alternatively, the court concluded that in the event the IRC limit applied to the annuity payment, as well as to the plan, the amount should have been recomputed annually as the limit was increased and the difference should be paid retroactively to respondent. Finally, the court concluded that although the petition requested damages for breach of contract, the case and the trial had all the aspects of a declaratory judgment action, which justified the court to order Rival to make the increased payments in the future.

There is no factual dispute presented by this case. The case presents a question of law and an interpretation of the agreement between the parties. Whether terms of an agreement are ambiguous is a question of law to be decided by the court and where there is no ambiguity, it is the trial court's responsibility to interpret the contract and state its meaning. *Maryland Casualty Co. v. Martinez*, 812 S.W.2d 876, 880 (Mo. App.1991); and *West v. Jacobs*, 790 S.W.2d 475, 480 (Mo.App.1990). The court determined the Agreement to be unambiguous and the parties agree with that conclusion. After reviewing the contract, we agree the relevant language is not ambiguous. *See Martinez*, 812 S.W.2d at 881. Finding the contract unambiguous, the trial court was then obligated to interpret the contractual language employed, giving the words used their plain and ordinary meaning. *See Krombach v. Mayflower Ins. Co.*, 785 S.W.2d 728, 731 (Mo.App.1990). However, an appellate court is not bound by the trial court's interpretation of the contractual language because, where the contract has been found to be unambiguous, a trial court's interpretation of the contract is a legal conclusion. *See Anchor Centre Partners, Ltd. v. Mercantile Bank*, 803 S.W.2d 23, 32 (Mo. banc 1991).

The crucial language in the Agreement, pertaining to the annuity, indicates Rival agreed to purchase an annuity "... provid-

ing a benefit which amounts to the difference between the pension benefits [the respondent was] entitled to receive under the Plan [at his actual date of termination] and those which [he] would have been entitled to receive under the Plan ... had [his] employment been terminated on [his] normal retirement date ..."

■ The first issue we address is whether the annuity payments are subject to the limitation imposed by § 415(b). We hold the payments are so limited. Section 415(b)(1) provides that benefits with respect to a participant exceed the limitation of this subsection if, when expressed as an annual benefit (within the meaning of paragraph (2)), such annual benefit is greater than the lesser of $90,000, or 100 percent of the participant's average compensation for his high three years.[3]

An "annual benefit" is defined by § 415(b)(2). Subparagraph (B) of that subsection and paragraph expressly includes, any "benefit under the plan [which is] payable in any form other than the form described in subparagraph (A)" and which is directly related to retirement income benefits, in determining whether the limitation described in paragraph (1) of § 415(b) has been satisfied. The annuity payments are directly related to and a part of respondent's retirement income benefits under the plan. Therefore, the IRC limit must apply to those payments. Further, Section 13.11 provides that the "total annual benefit" of any member "shall not exceed the limitations set forth in Section 13.11...." We hold that the payments received by Mr. Rootes, either under the plan or from the related annuity, are subject to the IRC limit.

■ That leaves us to determine the effect of the limitation with respect to the Agreement. The language of the Agreement states that Rival is to pay Mr. Rootes an amount he would otherwise have been entitled to receive had he retired on his

---

**3.** Since the promulgation of § 415, the IRC limit has been increased pursuant to § 415(d). As indicated above, at the time of Mr. Rootes's early retirement in 1988, the cap was set at $94,023.00 per year, or $7,835.25 per month.

Mr. Rootes average salary for his high three years exceeded the cap in 1988. Therefore, his monthly retirement benefits were limited to the $7,835.25 figure at that time.

514

normal retirement date. The difference in the amount of his retirement benefits at early retirement, if it occurred, and normal retirement, was to be made up by an annuity purchased by Rival. The undisputed testimony at trial was that the monthly payment amount Mr. Rootes was entitled to receive under the plan, had he left employment on his normal retirement date, was $8,837.98. The only restriction on that amount is set by the IRC limit.

The parties were aware that annual adjustments would be made to the IRC limit as provided by § 415(d). As stated above, Section 13.11 of the plan is patterned directly after § 415, which necessarily includes § 415(d). Therefore, we hold that Mr. Rootes is entitled to an amount, not to exceed the limit imposed by § 415(b), including any increases in that limit. Further, he is entitled to $8,837.98 per month as of January 1, 1991, the date when the IRC limit was increased to a figure in excess of his maximum benefits. The inconvenience to Rival of recalculating the amount each year or purchasing additional annuities does not change the outcome. Rival should have anticipated the increases when it entered the Agreement.

Rival also contends that Mr. Rootes should have been estopped from denying, or waived his right to deny, the applicability of the IRC limit. Rival argues that around the time of Mr. Rootes' retirement in 1988, he was given a computation of the monthly payments to be made per the Agreement and he allegedly made no objection to the computation; that he took affirmative action by demanding the funding of this benefit be made in the form of an annuity, thereby forcing Rival to purchase an annuity yielding the requisite monthly payment; that he signed the second page of the application which indicated the amount of the annuity; and that he reimbursed Rival for its federal and state withholding taxes due upon the cost of the annuity. Finally, Rival argues that Mr. Rootes accepted monthly payments under the annuity for 35 months prior to trial.

It is unclear whether Rival's complaint focuses on the applicability of the IRC limit

in general, or only that Mr. Rootes' is bound by the limit imposed in 1988. Assuming the point is directed to the general applicability of the IRC limit, we have held that the IRC limit is applicable to the annuity payments, regardless of Mr. Rootes' actions and, therefore, appellant's second point is rendered moot.

In the alternative, if Rival is claiming Mr. Rootes is bound to the 1988 figure based on the doctrines of estoppel and waiver, we find it failed to meet its burden of supporting these theories.

There are three requirements before equitable estoppel can be invoked. "[F]irst, an admission, statement or act by the person to be estopped that is inconsistent with the claim subsequently asserted and sued upon; second, action by a second party on the faith of such admission, statement or act; third, injury to the second party resulting from permitting the first party to contradict or repudiate his admission, statement or act." *Willman v. Phelps*, 631 S.W.2d 63, 67 (Mo.App.1982) (citations omitted).

Despite Rival's argument on appeal, a review of the transcript reveals a lack of a factual basis for each element of estoppel and the trial judge was entitled to consider the lack of evidence in determining whether to apply the doctrine. *Id.* Demanding that Rival comply with the terms of the Agreement by purchasing an annuity to fund the retirement benefits and accepting the annuity in an amount which complied with the IRC limit in 1988, does not establish the doctrine of estoppel with essential facts, supported by clear and satisfactory evidence. *Id.* By not finding in favor of appellant on this theory, the trial judge concluded the doctrine was not applicable to these facts, and we defer to that finding. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The burden of proving any estoppel rests on the party asserting it and that every fact essential to create it must be established by clear and satisfactory evidence. *Van Kampen v. Kauffman*, 685 S.W.2d 619 (Mo.App.1985). Appellant failed to meet its burden.

Rival also claims that Rootes waived his right to deny the applicability of the IRC limit and the purchase of the annuity in 1988, by his letter of October 12, 1988, and his demands that Rival purchase the annuity. The trial court's ruling on the factual question of waiver is entitled to the same weight as on the estoppel issue. *Murphy v. Carron*, 536 S.W.2d at 32.

 Appellant next contends the trial court erred by excluding evidence that the plan was modified as of December 31, 1989, which would have drastically reduced Mr. Rootes' monthly benefits. To give effect to the proffered evidence would be to allow the employer to change the terms of its contract with its retiree after retirement by reducing the amount of money to be paid. That was not the intention of the parties to this Agreement. Furthermore, the Agreement provided for a calculation of Mr. Rootes' retirement benefits at his normal retirement date based on an established formula contained in the Agreement and which the uncontroverted evidence proved to be a figure of $8,837.98.

The parties' Agreement was executed on April 6, 1986 and specifically refers to the plan in effect on November 15, 1985. Its purpose was to protect the retiree from any reduction in benefits which might occur due to his early retirement. The plan in effect on November 15, 1985 called for the retirement benefits we have considered in this opinion and not a subsequent retirement plan enacted after Mr. Rootes had retired. This point is devoid of merit.

We conclude the trial court correctly found Mr. Rootes was entitled to increased retirement benefits and retroactive payment of those benefits. However, the amount of the benefits awarded for the years 1988, 1989 and 1990 were subject to the IRC limits for each year respectively.

There are several collateral issues raised on appeal which have been rendered moot by our holding and we decline to address those issues. Therefore, we hold that the payments received by Mr. Rootes during the year 1988 were in the correct amount; that he is entitled to an additional $336.75 for each month in 1989 (a total of $4,041.00); that he is entitled to an additional $713.25 for each month in 1990 (a total of $8,559.00); that he is entitled to an additional $1,002.73 for each month in 1991 up and through the month of June, 1992 (a total of $18,049.14); and that he is entitled to 9% interest on the amount awarded from the date each payment became due until the date of this judgment.[4]

The judgment of the trial court is reversed and judgment entered for plaintiff and against defendant in the total principal amount of $30,649.14, plus 9% interest computed from the due date of each payment.

All concur.

---

**4.** The petition specifically prayed for "amounts as become due prior to judgment" and we determine the amount from the date of this judgment, not the date of judgment at the trial court in June of 1991.