# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-1236, 03-1241, and  03-1244

_____

| | | |
|---|---|---|
| In re:  Leroy J. Lauer, | * | |
| | * | |
| Debtor. | * | |
| ---------------------------------------------- | * | |
| Harriet Nangle Rose; Ellen Catherine | * | |
| Nangle; Timothy Michael Nangle, | * | |
| | * | |
| Appellants/Cross-Appellees, | * | |
| | * | |
| Land Investment Club, Inc., | * | Appeals from the United States |
| | * | District Court for the |
| Appellant, | * | Eastern District of Missouri. |
| | * | |
| v. | * | |
| | * | |
| Leroy J. Lauer, | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | |
| U.S. Bank, N.A., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  January 12, 2004
Filed:  June 10, 2004

_____

Before LOKEN, Chief Judge, FAGG and BOWMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

These are adversary proceedings arising out of the personal bankruptcy of Leroy J. Lauer, who was a general partner in Crossroads U.S.A. Limited II, a Missouri limited partnership. In October 1982, Lauer and Joseph Graves, the other general partner, purchased the interests of limited partners Harriet Nangle Rose, Timothy Nangle, and Ellen Nangle, financing the purchase with the proceeds of a loan to Crossroads from Mark Twain Bank (now U.S. Bank). The Nangle limited partners sued Lauer and U.S. Bank, seeking to prevent Lauer's discharge in bankruptcy and to recover compensatory and punitive damages for fraud. Land Investment Club, Inc. ("LIC"), brought a separate derivative action, alleging it is still a Crossroads limited partner and seeking similar relief. Plaintiffs alleged that Lauer fraudulently failed to disclose material changes in the Crossroads assets prior to the buyout and that U.S. Bank knew about the fraud and received an improper pledge of partnership assets. On a prior appeal, we reversed the grant of summary judgment to U.S. Bank. In re Lauer, 98 F.3d 378 (8th Cir. 1996). The district court then consolidated the cases and assigned them to a special master who held a bench trial and made recommended findings and conclusions that the district court adopted after review and oral argument. See FED. R. CIV. P. 53(g).

The Nangles and LIC appeal, arguing that the district court erred in dismissing all claims by LIC because it was not a Crossroads limited partner; in refusing to award punitive damages against Lauer for his fraud; and in dismissing their claims against U.S. Bank for breach of fiduciary duty. Lauer cross appeals, arguing the court erred in awarding $148,872.72 in compensatory damages, in awarding prejudgment interest, and in declaring his liability to the Nangles nondischargeable in bankruptcy. The applicable state law is the law of Missouri. Lauer, 98 F.3d at 382. Reviewing the district court's findings of fact for clear error and its legal determinations de novo, we reverse the award of prejudgment interest and otherwise affirm.

# I. Background.

Among other investments, Crossroads owned a thirty-seven percent minority interest in River Heights Joint Venture, which owned a nursing home. River Heights sold the nursing home in 1982, receiving industrial revenue bonds issued by the City of Boonville, Missouri. Crossroads' share was reflected in a $450,000 industrial revenue bond payable jointly to River Heights and Crossroads ("the Bond"). The Bond paid interest at the rate of twelve percent per annum and matured in 2007.

Later that year, Lauer and Graves purchased the Nangles' limited partnership interests in Crossroads. For her six percent interest, Harriet Nangle Rose received $12,727.28 immediately and a promise of $4,000 annually over the next five years. For their 22% interest (received from their father, Bruce, a lawyer who drafted the sale contracts), Timothy and Ellen Nangle received $40,000 immediately and a promise of $16,000 annually over the next five years. The sale contracts recited that Lauer and Graves were acquiring all limited partner interests, giving them complete ownership of Crossroads. The deferred payments to the Nangles were secured by a pledge of the "partnership . . . interest . . . Crossroads . . . has as a joint venturer in a certain nursing home known as River [H]eights Retirement Center." Neither Lauer nor Graves informed the Nangles that River Heights had sold the nursing home. To finance the purchases, Lauer and Graves caused Crossroads to borrow $175,000 from U.S. Bank, secured by the Bond and other Crossroads property. The bank dispersed the loan proceeds to Crossroads which then loaned the proceeds to Lauer and Graves. The special master found that U.S. Bank had no "reason to believe that Lauer and Graves had misrepresented the value of the partnership assets to the limited partners."

After receiving the initial payments of $12,727.28 and $40,000, the Nangles received no deferred payments from Lauer or Graves. Crossroads defaulted on its loan to U.S. Bank. The Nangles learned of the nursing home sale after Graves's death in 1983 and began this litigation in state court. Interest payments on the Bond ceased

in 1985. Lauer filed for bankruptcy relief in 1986. These adversary proceedings commenced in February 1987.

## II. LIC's Claims.

LIC appeals the district court's judgment dismissing LIC's derivative claims against Lauer and U.S. Bank based on the special master's finding that LIC failed to prove a partnership interest entitling it to sue on behalf of the Crossroads partnership. LIC argues that this finding is clearly erroneous and, in the alternative, that LIC need not be a limited partner to have standing to bring its derivative claims under the applicable Missouri statute. We disagree.

LIC's claim of standing is based on a June 15, 1981, "Assignment and Transfer of Interest" in which Graves purported to assign his eleven percent limited partner interest in Crossroads to LIC in exchange for $75,000. The document recites that LIC will pay for this interest by assigning to Graves 75,000 shares of LIC preferred stock and will amend its articles of incorporation to increase LIC's capitalization "so as to permit . . . the sale and transfer of said limited partnership interest." Graves signed the notarized document twice, once for himself as seller of the partnership interest and once for LIC as purchaser. There is no evidence that sixty percent of all Crossroads partners approved the substitution of LIC as a limited partner, as Article 7.2 of the partnership agreement required; no evidence that the Crossroads partnership agreement was amended to reflect LIC as a limited partner; and no evidence that LIC ever amended its articles of incorporation and transferred preferred stock to Graves to complete his assignment of the limited partner interest. Lauer testified that he was not aware in 1982 that LIC had a limited partner interest. Graves's signed financial statement dated August 16, 1982, listed the Crossroads partners, did not list LIC as a limited partner, and stated that Graves still held the eleven percent limited partner interest. Thus, the special master's finding that LIC was never formally substituted as a limited partner is well supported by the record.

The Missouri Limited Partnership Law was amended in 1985 to provide that a limited partner may bring a derivative action on behalf of the partnership if he was a partner at the time of the transaction complained of or "[h]is status as a partner had devolved . . . pursuant to the partnership agreement from a person who was a partner at the time of the transaction." MO. REV. STAT. § 359.581. Under this statute, LIC lacks standing because it never acquired limited partner status in accordance with the Crossroads partnership agreement. Under the prior statute, in effect when the transactions complained of occurred, a limited partner had standing to bring a derivative action. See Allright Mo., Inc. v. Billeter, 829 F.2d 631, 635-38 (8th Cir. 1987). However, that statute provided that "[a]n assignee, who does not become a substituted limited partner, has no right to require any . . . account of the partnership transactions." MO. REV. STAT. § 359.190 (1968) (repealed by the 1985 amendments). Thus, even if LIC was an assignee by reason of the June 15, 1981, document, it lacked standing to assert a derivative claim under Missouri law.

### III.  The Nangles' Claims.

**A. Claims Against Lauer.**  On appeal, Lauer does not challenge the district court's decision that he committed fraud and breached a general partner's fiduciary duty by misrepresenting the condition of Crossroads' assets prior to purchasing the Nangles' limited partner interests. Instead, Lauer challenges the court's calculation of compensatory damages, the assessment of prejudgment interest, and the determination that his liability is non-dischargeable in bankruptcy. The Nangles appeal the denial of punitive damages and the amount of prejudgment interest.

**1. Compensatory Damages.**  Under Missouri law, a victim of fraud in the inducement may elect to rescind the transaction or sue to recover the benefit of the bargain, that is, "the difference between the actual value of the property and what its value would have been if the property had been as represented," measured as of the

time of the transaction that was fraudulently induced. <u>In re Usery</u>, 123 F.3d 1089, 1093 (8th Cir. 1997) (quotation omitted).

The special master found that the actual value of the Crossroads partnership was $720,000 when Lauer and Graves purchased the Nangles' limited partner interests. Lauer attacks that finding as speculative, but it is well supported by the evidence and therefore not clearly erroneous. Graves listed the value of Crossroads as $729,875 in an August 1982 financial statement. U.S. Bank officer Darrell Roegner listed the value of Crossroads as $720,000 in a July 1982 memorandum, based on information Lauer and Graves provided to Roegner.

The special master found that, but for Lauer's fraud and breach of fiduciary duty, Harriet Nangle Rose would have received six percent of Crossroads' actual value, or $43,200, and Timothy and Ellen Nangle would have received twenty-two percent of actual value, or $158,400. In calculating the Nangles' compensatory damages, the special master did not simply compare these amounts with the total purchase prices, $32,727.28 to Harriet Nangle Rose and $136,000 to Timothy and Ellen Nangle. Instead, the special master included as fraud damages the deferred payments the Nangles were promised but never received, which increased the damage awards to $30,472.72 for Harriet Nangle Rose and $118,400.00 for Timothy and Ellen Nangle. On appeal, Lauer argues that including the unpaid deferred payments awarded the Nangles damages for a subsequent breach of contract, whereas his liability for fraud must be limited to the benefit of their initial bargains.

The Nangles' fraud claims focused on Lauer's failure to disclose the prior sale of the River Heights nursing home. The sale contracts provided that the deferred payments were secured by an assignment of Crossroads' interest in the River Heights joint venture. Because of the undisclosed nursing home sale, that interest included the $450,000 Bond Crossroads received as its share of the sale proceeds. If the Bond was inadequate collateral, that might well be an injury unrelated to the initial fraud.

-6-

But the injury in this case was not unrelated, because the sale contracts further provided that Lauer and Graves "will not, without the consent of [the Nangles] impair or further encumber . . . the assets of said joint venture." Contrary to that promise, Lauer and Graves pledged the Bond to U.S. Bank to secure the loan to Crossroads that funded their purchase of the limited partner interests, an undisclosed fact that severely impaired the collateral securing the Nangles' deferred payments. In these circumstances, the district court did not err by including the unpaid deferred payments in estimating the damages caused by Lauer's fraud. Under Missouri law, the victim of fraud or misrepresentation need only prove the amount of damages with reasonable certainty. See Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc., 178 F.3d 1030, 1034-35 (8th Cir. 1999); Shechter v. Brewer, 344 S.W.2d 784, 790-91 (Mo. App. 1961).

**2. Punitive Damages.** The Nangles appeal the district court's denial of their claims for punitive damages. Under Missouri law, "punitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences." Burnett v. Griffith, 769 S.W.2d 780, 787 (Mo. banc 1989). Because punitive damages are "extraordinary and harsh," a common law claim requires clear and convincing proof. Rodriguez v. Suzuki Motor Corp., 936 S.W.2d 104, 111 (Mo. banc 1996).

The special master found that Graves, not Lauer, was "the impetus behind" the buyout transactions and that "Graves, not Lauer, had an evil motive in failing to disclose the changes in the Partnership's assets." The Nangles attack these findings as clearly erroneous, pointing to evidence of Lauer's activities as a general partner and his involvement in the transactions, including an internal credit memorandum written by Roegner of U.S. Bank. But the record contains substantial evidence that Graves was the driving force behind Crossroads and that Lauer considered himself a passive partner and relied on Graves and Bruce Nangle to manage the partnership

affairs.  Thus, the record falls short of establishing the requisite evil motive by clear and convincing evidence, and the district court did not err in declining to award punitive damages.

**3. Prejudgment Interest.**  The district court awarded Harriet Nangle Rose $42,052.37 in prejudgment interest and Timothy and Ellen Nangle $163,392.00 in prejudgment interest.  Lauer appeals those awards, arguing that the Nangles' claims were not liquidated or readily ascertainable.  The Nangles cross appeal, arguing that prejudgment interest should be calculated from an earlier date.  We agree with Lauer and reverse the award of prejudgment interest.

As the special master noted, under Missouri law prejudgment interest is not allowed in tort cases unless the misconduct conferred a benefit on the defendant and the damages are liquidated, that is, readily ascertainable.  See Schreibman v. Zanetti, 909 S.W.2d 692, 704-05 (Mo. App. 1995).[1]  The special master concluded that the Nangles' damages are readily ascertainable because "[t]he market value of the partnership assets were established by appraisal as of the date the [Nangles] sold their respective interests."  However, as our discussion of the compensatory damage awards explains, even if the market value of Crossroads partnership interests was readily ascertainable, whether the unpaid deferred payments were properly included as damages *for fraud* was a hotly contested issue.  When the measure of damages in a tort case is contested, the damages are not readily ascertainable and prejudgment interest may not be awarded.  See Ritter Landscaping, Inc. v. Meeks, 950 S.W.2d 495, 497 (Mo. App. 1997); St. John's Bank & Trust Co. v. Intag, Inc., 938 S.W.2d 627,

---

[1]Lauer argues that prejudgment interest may not be awarded because the Nangles did not make a demand for payment or an offer of settlement, as MO. REV. STAT. § 408.040.2 requires.  See Union Pac. R.R. v. Carrier Consultants, Inc., 973 S.W.2d 500, 503 (Mo. App. 1998).  The Nangles reply that this statute may not be retroactively applied to their preexisting claims.  We need not consider these issues.

-8-

630 (Mo. App. 1997); Schreibman, 909 S.W.2d at 704-05.  Thus, the awards of prejudgment interest are reversed.

**4. Is Lauer's Liability Dischargeable?**  In the district court, the Nangles argued that Lauer's fraud liability is nondischargeable under several exceptions to discharge found in 11 U.S.C. § 523(a).  The district court held the debt nondischargeable under § 523(a)(2)(A) and did not consider other exceptions.  Section 523(a)(2)(A) makes nondischargeable a debt "for money, property, services, or . . . credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  This subsection continues the Bankruptcy Code's long-standing policy of "prohibit[ing] debtors from discharging liabilities incurred on account of their fraud."  Cohen v. De La Cruz, 523 U.S. 213, 217 (1998).

On appeal, Lauer does not argue that the Nangles failed to prove the elements of actual fraud that bar discharge under § 523(a)(2)(A).  See In re Ophaug, 827 F.2d 340, 342 n.1 (8th Cir. 1987); cf. Neal v. Clark, 95 U.S. 704, 709 (1877).  Rather, he contends that § 523(a)(2)(A) does not apply for two reasons.  First, he argues that he did not obtain money by fraud, as § 523(a)(2)(A) requires.  This contention is without merit.  The Nangles' limited partner interests were "property" that Lauer and Graves obtained by fraudulently misrepresenting Crossroads' assets, bringing their fraud squarely within the coverage of § 523(a)(2)(A).

Second, Lauer argues that his fraud falls within § 523(a)(2)(B), rather than § 523(a)(2)(A), because the failure to disclose the sale of the River Heights nursing home was a "statement respecting the debtor's or an insider's financial condition"for purposes of the financial statement exception to § 523(a)(2)(A).  The Bankruptcy Code defines "insider" to include a partnership in which an individual debtor is a general partner.  See 11 U.S.C. § 101(31)(A)(ii).

Subsections 523(a)(2)(A) and (B) are mutually exclusive. First Nat'l Bank of Olathe v. Pontow, 111 F.3d 604, 608 (8th Cir. 1997). Courts have disagreed over whether to construe § 523(a)(2)(B) broadly to include any statement reflecting on the financial condition of the debtor or an insider, which might include misrepresentations concerning specific assets such as the River Heights joint venture. See In re Bogdanovich, 292 F.3d 104, 112-13 (2d Cir. 2002) (collecting cases). In considering this issue, we note that § 523(a)(2)(B) is the more specific provision, recently amended to reflect Congress's recognition of "the peculiar potential of financial statements to be misused not just by debtors, but by creditors" such as "consumer finance companies, which sometimes have encouraged [false financial statements] by their borrowers for the very purpose of insulating their own claims from discharge." Field v. Mans, 516 U.S. 59, 76-77 (1995). Here, the transaction was a sale, not a loan, and the party claiming fraud was the seller, not a creditor that routinely required the submission of financial statements. Lauer and Graves committed garden variety common law fraud when they induced the Nangles to sell their limited partner interests by concealing material changes in the Crossroads asset mix. In these circumstances, we agree with the special master that Lauer's fraud is analogous to the fraud described by the Supreme Court in Field v. Mans, 516 U.S. at 61-62, where the Court applied § 523(a)(2)(A). The fraud liability is therefore nondischargeable. Accord In re Joelson, 307 B.R. 689 (B.A.P. 10th Cir. 2004).

**B. Claims Against U.S. Bank.** Lauer and Graves as Crossroads' general partners had fiduciary duties to the Nangles as limited partners. The Nangles' amended complaint alleged that U.S. Bank is liable under the Missouri Uniform Fiduciaries Law (UFL), MO. REV. STAT. §§ 456.240-.350, because it had actual knowledge of Lauer's breach of fiduciary duty. The special master rejected this claim on the grounds that U.S. Bank had no actual knowledge of Lauer's breach of fiduciary duty and there was no evidence that the loan was "commercially unjustifiable or that the Bank intentionally evaded or disregarded facts that suggested

-10-

fraudulent activity or breach of fiduciary duty." On appeal, the Nangles argue that these findings are clearly erroneous. We disagree.

At the outset, we note that the Nangles' claim against U.S. Bank, as pleaded, is not a UFL claim. "The Uniform Fiduciaries Act was designed to facilitate commercial transactions in negotiable instruments held in trust, by relaxing some of the harsher [common law] rules which require . . . the highest degree of vigilance in the detection of a fiduciary's wrongdoing." Trenton Trust Co. v. Western Sur. Co., 599 S.W.2d 481, 490 (Mo. banc 1980) (quotation omitted). The individual sections of the UFL govern the liability of third parties who deal with fiduciaries in specific types of transactions, those involving payments to fiduciaries, transfers of negotiable instruments by fiduciaries, checks drawn by or payable to fiduciaries, and deposits by or to the benefit of fiduciaries. See §§ 456.250-.320. All other transactions are governed by common law rules governing the liability of a third party for a fiduciary's breach of duty, though UFL principles may be instructive. See § 456.330; Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A., 803 S.W.2d 23, 31 (Mo. banc 1991).

In the district court, the Nangles alleged that U.S. Bank had actual knowledge of a specific breach of fiduciary duty -- Lauer's failure to disclose that the River Heights nursing home was sold prior to the purchase of the Nangles' limited partner interests. That claim bears no resemblance to the transactions specifically governed by the UFL. Nonetheless, accepting the Nangles' invitation to apply UFL principles, the special master found that U.S. Bank had no actual knowledge of this breach of fiduciary duty and that the loan to Crossroads was not made in bad faith, that is, in a commercially unjustifiable manner, because the partnership agreement granted broad powers to the general partners and U.S. Bank understood the loan proceeds would be used for a proper purpose, namely, to permit all limited partners to sell their interests to the general partners.

-11-

On appeal, the Nangles agree that the special master applied the correct UFL legal standards.  See In re Lauer, 98 F.3d at 378 n.5, 382-83; General Ins. Co. v. Commerce Bank of St. Charles, 505 S.W.2d 454, 456-58 (Mo. App. 1974).  The Nangles now abandon the fact theory pleaded in their amended complaint and addressed by the special master in great detail -- that U.S. Bank knew Lauer and Graves did not disclose the prior sale of the River Heights nursing home.  Instead, the Nangles argue (i) that U.S. Bank knew or should have known from the partnership agreement and partnership law that causing Crossroads to borrow money so that the general partners could buy out the limited partners served no legitimate partnership purpose and was ultra vires; and (ii) that U.S. Bank knew or should have known that Lauer and Graves were cheating the limited partners because the general partners were paying less than they valued their own partnership interests in contemporaneous financial statements submitted to U.S. Bank.  The special master rejected the first theory after a careful review of the partnership agreement and the evidence of U.S. Bank's understanding of the purpose of the loan.  We agree.  Under the UFL, U.S. Bank was entitled to presume that Lauer and Graves were causing Crossroads to borrow money for a partnership purpose, in this case, to consolidate ownership and eliminate dissension by buying out limited partners who no longer supported the partnership's real estate investment strategy.  See In re Broadview Lumber Co., 118 F.3d 1246, 1251 (8th Cir. 1997).  The second theory was not considered by the special master and may not have been raised in the district court.  Assuming it was preserved, it is so far removed from any claim properly governed by the UFL that it fails as a matter of law.

Given our prior discussion of the compensatory damages recoverable from Lauer, it is appropriate to note that the Nangles do not argue that U.S. Bank took a pledge of the Bond as security for a loan for the benefit of the general partners with actual knowledge that Lauer and Graves promised the Nangles not to impair this partnership property.  Such a contention would make the case factually similar to Trenton Trust, 599 S.W.2d at 490-94, except that Trenton Trust involved a pledge of

trust property, not of a partnership asset. But the theory was not presented to us, and we do not consider it.

For the foregoing reasons, we affirm the district court's dismissal of all claims against U.S. Bank. We also reject the Nangles' appeal from the district court's order denying their motion for discovery sanctions under Federal Rule of Civil Procedure 37(c)(1). "We will not reverse a district court's discovery ruling absent a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." Tenkku v. Normandy Bank, 348 F.3d 737, 743 (8th Cir. 2003) (quotation omitted); see also Bunting v. Sea Ray, Inc., 99 F.3d 887, 890 (8th Cir. 1996). As U.S. Bank produced the disputed documents long before trial, there was no abuse of the district court's substantial discovery discretion.

## IV. Conclusion.

The judgment of the district court dated November 21, 2002, is modified to delete the awards of prejudgment interest to Harriet Nangle Rose ($42,052.37) and to Timothy Nangle and Ellen Nangle ($163,392.00). As so modified, the judgment is affirmed.

_____