William Porter RICKABAUGH, Debtor.

Randall C. Davis; David Mutum; R.C.D. Inc.; Mutum Inc.; R.D. Contracting Inc.; and D.E.M. Inc., Plaintiffs,

v.

William Porter Rickabaugh, Defendant.

Bankruptcy No. 05–00258.
Adversary No. 05–30047–wle.

United States Bankruptcy Court,
S.D. Iowa.

Sept. 28, 2006.

746

Richard D. Crotty, Council Bluffs, IA, for Debtor.

Christopher D. Curzon, Omaha, NE, David J. Koukol, Omaha, NE, for Plaintiffs.

## ORDER RE: COMPLAINT TO DETERMINE DISCHARGEABILITY

WILLIAM L. EDMONDS, Bankruptcy Judge.

The matter before the court is the final trial of plaintiffs' complaint to determine the dischargeability of their claim pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). Trial was held June 6, 2006 in Council Bluffs. Plaintiffs Randall C. Davis, David Mutum, R.C.D., Inc., Mutum, Inc., R.D. Contracting, Inc., and D.E.M., Inc. (hereinafter "Plaintiffs" or "Davis and Mutum") were represented by attorney Christopher D. Curzon. Attorney Richard D. Crotty appeared for defendant William Porter Rickabaugh. The parties have filed post-trial briefs. The court now issues its findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Findings of Fact

Randall Davis and David Mutum are individuals who have operated as contractors in the Omaha, Nebraska area. The corporate plaintiffs are entities in which Davis and Mutum have interests as officers and shareholders. Beginning in about 1989, Davis and Mutum were in the iron work business together, doing rebar placement and later doing structural steel erection work.

In about the early 1990s, Davis and Mutum entered into a collective bargaining agreement with the Ironworkers Local 21 labor union (the "union"). The term of the agreement was for three years. Plaintiffs' relationship with the union was poor, which Davis attributed to their not following the normal course of affiliation with the union. Davis and Mutum did not come into the union through an apprenticeship program, but just set themselves up as contractors. When plaintiffs called the union hall for workers, Davis said, the union would send laborers who were not qualified to lead a job or manage the work. He believed this poor relationship hindered the ability of their business to grow.

William Rickabaugh, age 59, works as an accountant. Davis first met Rickabaugh in the 1980s at a family church event. The two became friends. Davis hired Rickabaugh to do accounting work and to pre-

pare personal and business tax returns. In 1992, Rickabaugh graduated from law school.

In about 1996, Davis and Mutum sought legal advice from Rickabaugh regarding their desire to "get out of" their contract with the union. At that time, Rickabaugh was working as an accountant for the company Inacom. He practiced law part-time. Rickabaugh advised plaintiffs that they could form new corporations and then operate those corporations using non-union labor. Davis and Mutum followed this advice and hired Rickabaugh to form the new entities.

On or about June 25, 1998, the Omaha Construction Industry Pension Fund, Ironworkers Union Local 21, and others sued plaintiffs in the United States District Court for the District of Nebraska ("union litigation") for breach of the collective bargaining agreement. Despite his lack of experience in either labor law or federal court litigation, Rickabaugh undertook the defense of the lawsuit on behalf of Davis, Mutum, and their corporate entities.

In the spring of 1999, Rickabaugh advised Davis and Mutum not to bid any new construction jobs. He assured them that he was negotiating a settlement with the union. Davis and Mutum themselves did a small project at a juvenile detention center that did not require hiring employees. They did no contracting work during the summer of 1999.

In the spring or summer of 1999, Davis and Mutum made a bid for the structural steel subcontract on a Super Saver store in Millard, Nebraska. They were awarded the $84,000 contract. Rickabaugh assured plaintiffs that he would have the union litigation settled before the fall start date. Davis said they kept the project "under wraps" through the summer. At some point in the fall of 1999, Rickabaugh told them to begin work on the Super Saver job, again assuring them that the union litigation would be settled. Prior to November 15, 1999, the union advised Davis and Mutum that their work on the Super Saver project was in violation of the collective bargaining agreement, and they were forced to stop work on the project. The contractor hired another steel erection firm for a higher contract amount. Exhibit 13.

Rickabaugh was involved in various discussions regarding settlement of the union litigation. In about early November 1998, there was a meeting attended by Rickabaugh and Davis with union attorneys Robert Henry and Dean Kratz. Davis recalled that Mr. Henry had mentioned they could be liable for up to $100,000 but that the matter could possibly be settled for $10,000. In about the spring of 1999, Rickabaugh told Davis and Mutum that they each might have to pay $10,000 to settle the lawsuit. Davis understood this to mean that after paying a monetary settlement, they would be allowed to do contracting on a non-union basis.

In the fall of 1999, prior to commencement of work on the Super Saver store, Rickabaugh told Davis that negotiations had broken down and that the union wanted more money to settle the matter. Rickabaugh recommended that Davis and Mutum proceed to litigation. A week later, Rickabaugh advised them to settle the matter for a total of $31,000.

At the end of October, Davis and Mutum were feeling stress from the uncertainty of the situation. They had spent $37,000 to purchase equipment to help with the Super Saver project. They had begun work on the job, but they still had not seen a settlement agreement. On November 2, 1999, Davis told Rickabaugh that they were considering hiring a new attorney. Davis said that Rickabaugh "broke down"

and admitted he had committed legal malpractice. During the dischargeability trial, Davis gave the following testimony when asked by his own attorney what he and Rickabaugh discussed about what should be done:

Well, it ended up being that he—he said he was in violation or in malpractice and that he would take care of me financially on any court problems or legal problems, that he would retain us an attorney.

If we had to go to Kansas City or St. Louis, Chicago, or wide in a circle all the way to Pennsylvania, he would get me the biggest and best law firm there was if I would sign a contract with a union. And that he felt—he feared for his job. He also had a job with Inacom Corporation and that. They were working with McGrath North, which was part of this lawsuit deal, just on the other side, and that he felt there was a great conflict there and that he was going to lose his job or possibly get disbarred or whatever it is.

He was really upset about that and had us convinced that we were basically toast, and we should sign this contract and that—and then I agreed with that and then I felt that both of us shouldn't be—shouldn't go down with the ship, so to speak.

On October 5, 1999, the United States District Court for Nebraska was advised that the parties to the union litigation had settled the matter. The deadline for filing settlement documents was November 4. The union had taken the position that it had made a settlement agreement and that the agreement would not permit the Super Saver job to go forward as a non-union project. Davis and Mutum had not agreed to settle on these terms. Rickabaugh believed the union was prepared to force the issue by having its attorney Mr. Henry

testify, requiring Rickabaugh to be a witness. The union would then bring in the McGrath North firm as trial counsel. McGrath North also represented Inacom, Rickabaugh's employer. Rickabaugh first disclosed this conflict of interest during the November 2, 1999 conversation with Davis.

Rickabaugh told Davis that plaintiffs' liability could reach $275,000 or more and that their personal assets could be at risk if the parties did not settle and the matter went to trial. On November 3, 1999, Davis and Mutum told Rickabaugh that they would agree to settle with the union if Rickabaugh would indemnify them. *See* Exhibit 21, ¶ 6. They still understood that settlement required only the payment of $31,000 on their part.

By letter to Davis dated November 10, 1999, Rickabaugh admitted that his advice in 1995 or 1996 to form new corporations as a way to obtain release from the union contract amounted to legal malpractice. The letter referred to a "proposed monetary settlement ... under a separate document." Exhibit 10.

Within days after the November 2 conversation, Davis and Mutum took documents relating to the union litigation to the law firm of Behrens and Tate. There they spoke briefly with Tim Welsch. An attorney at the Behrens and Tate firm reviewed the settlement agreement document and left Davis and Mutum a voice mail message. Davis and Mutum did not engage the firm to represent them. The Behrens and Tate attorney was leaving town and would not be available. Davis and Mutum understood from the attorney's message that they were bound by the settlement agreement even though they had not signed it.

Davis and Mutum then contacted Mr. Weinberg, an attorney whose name they

found in a telephone book. Davis took documents to Weinberg's office. Rickabaugh faxed a copy of the settlement agreement to Weinberg with the dollar amount to be paid "whited out." Later the same day Rickabaugh provided Weinberg with a copy of the agreement that was not whited out. From their meeting with Weinberg, Davis and Mutum learned for the first time the terms of the settlement agreement.

The agreement was in the form of a Stipulation for Entry of Judgment ("Stipulation") with a Memorandum of Agreement ("Memorandum") attached as Addendum A. The Stipulation, among all the parties to the union litigation in federal court, provided that Davis and Mutum and their corporations would be jointly and severally liable for judgment in the amount of $63,000. The sum of $25,000 was to be paid upon execution of the settlement documents. The balance of $38,000 was to be paid at seven percent interest over five years in minimum monthly installments of $752.45. Davis and Mutum would be required to grant security interests in their property to secure payment. Beginning on page 7 of the document, the Stipulation provided as follows:

### EXECUTION OF NEW COLLECTIVE BARGAINING AGREEMENTS AND MATERIAL BREACHES THEREUNDER

31. Contemporaneously with the signing of this Stipulation, Defendants, and each of them shall execute a "Memorandum of Agreement," a copy of which is attached hereto as "Addendum A."

32. Defendants acknowledge their understanding that the aforesaid Memorandum of Agreement imposes upon Defendants continuing obligations that include the timely payment of fringe benefit contributions to the Funds. De-

fendants further acknowledge their understanding that their continuing obligations arising under the Memorandum of Agreement are in addition to, and not in lieu of, Defendants' obligation to make the monthly payments provided in this Stipulation. Notwithstanding the separate nature of Defendants' two contribution obligations, however, it is agreed and understood that the failure of Defendants to make full and timely fringe benefit contributions to the Funds as they become due under the aforesaid Memorandum of Agreement shall also be considered a material breach of this Stipulation.

33. It shall further be considered a material breach of this Stipulation for Defendants, or any of them, to establish and/or operate any new companies, whether single proprietorships, partnerships, limited partnerships, corporations, or any other business entity of any kind, where it is determined in the sole discretion of the Plaintiffs that a purpose of such companies is to evade any of the obligations imposed either under the Memorandum of Agreement, or this Stipulation, or both.

Exhibit 9.

The Memorandum of Agreement was between Davis and Mutum and their corporations, referred to collectively as "the Employer," and the Ironworkers Local 21. The Memorandum would bind Davis and Mutum to the terms of the collective bargaining agreement between the union and the Omaha Building Contractors Employers Association for the next five years. Exhibit 35. Davis understood the Memorandum to mean that he would be able to employ non-union workers if he paid wages and made benefits contributions according to the terms of the collective bargaining agreement.

After reviewing the terms of the settlement agreement with Weinberg, Davis and Mutum knew that settlement of the union litigation would require them to pay $63,000 and to enter into a new collective bargaining agreement with the union. Davis and Mutum concluded that their settlement with Rickabaugh for his legal malpractice was inadequate. Attorney Weinberg assisted them in drafting a new agreement with Rickabaugh. Weinberg did not undertake to represent them in the union lawsuit.

After a November 4, 1999 conference call with the union litigation parties, the United States District Court for Nebraska extended the deadline to file settlement documents to November 16. A meeting to execute the settlement documents was set for 11:00 on the morning of November 15. Earlier that same morning, Davis and Mutum met with Rickabaugh at Davis's home and executed settlement agreements regarding Rickabaugh's legal malpractice. It appears that the parties executed both the settlement document prepared by Rickabaugh and the document prepared by Weinberg. *See* Exhibit 11. Rickabaugh agreed to pay the $63,000 required to settle with the union. He agreed to give Davis and Mutum a note secured by a mortgage on his home and business property. He agreed to pay the damages caused by breach of the Super Saver contract. He agreed to purchase a term life insurance policy on his own life with a death benefit of $250,000, to pay the premiums on the policy, and to name Davis and Mutum as the beneficiaries. The malpractice settlement anticipated that Davis and Mutum would execute the Stipulation for Entry of Judgment and Memorandum of Agreement, and that Rickabaugh would pay the damages arising "currently or in the future as a result of" executing those documents or as a result of "any participation agreements signed with Ironworkers Local No. 21." Exhibit 11, ¶ (1). Rickabaugh further agreed to—

> Pay all Attorney Fees and Court Costs as well as the Costs of any Proceedings for any Attorneys [to] Protect [Davis and Mutum] from any Liability arising now or in the future with regard to ... Collective Bargaining Agreements, Participation Agreements, or any other term and condition of settlement of [the union litigation] including but not limited to the termination, avoidance, or restructuring of [Davis and Mutum's] Business to escape and/or reduce the effect of the settlement in [the union litigation] or any Agreement or Conditions arising therefrom.

Exhibit 11, ¶ (3).

Rickabaugh gave Davis and Mutum a mortgage on his property in Tabor, Iowa to secure a note for $25,000. The mortgage was recorded in Fremont County, Iowa on November 19, 1999. Exhibits 12, 14.

After executing the documents in settlement of Rickabaugh's legal malpractice, Davis and Mutum met with representatives of the union and executed the Stipulation for Entry of Judgment and Memorandum Agreement. Rickabaugh attended the settlement meeting but did not review the settlement documents with Davis and Mutum. Davis and Mutum paid $25,000 of the settlement amount. Rickabaugh produced a check for $38,000 for the balance. The Stipulation for Entry of Judgment and a satisfaction of judgment were filed with the court.

In the first part of 2000, Davis and Mutum, through new counsel, filed a motion in the union litigation case for relief from judgment. By order issued June 14, 2000, the court denied the motion. Davis and Mutum had stated, as a ground for the motion, that "misrepresentation and mis-

conduct was committed by [Rickabaugh] who became adverse to his clients and thereby did not properly defend and protect the interests of [Davis and Mutum] and counseled and advised them to enter into a Stipulation that significantly impacts their livelihood." Exhibit 36. The United States District Court, Judge Thomas M. Shanahan, observed that Davis and Mutum had acknowledged "that they suspected their attorney's wrongdoing and had even consulted other legal counsel before signing the Consent Judgment and Stipulation." *Id.*

After the conclusion of the union litigation, Davis and Mutum regularly received offers to bid on jobs for steel erection. They turned down "a lot of jobs." Davis said he no longer wanted to be involved with the union. He now has a trucking business, hauling sand and gravel.

Davis and Mutum filed a lawsuit against Rickabaugh for malpractice in late 2000. On August 20, 2001, the Counsel for Discipline of the Nebraska Supreme Court filed formal charges against Rickabaugh. He was disbarred from the practice of law in Nebraska on July 19, 2002. *State of Nebraska v. Rickabaugh*, 264 Neb. 398, 647 N.W.2d 641 (2002). The judgment of disbarment was based on two matters: Count I, the union matters, and Count II, collection of a debt from Upland Construction Co. In regard to the union matters, the Nebraska Supreme Court summarized the referee's findings that Rickabaugh "failed to inform [Davis and Mutum] that he was not qualified, either by experience or training, to give ... advice" regarding collective bargaining agreements or "to handle the representation of a lawsuit in federal court." *Id.*, 647 N.W.2d at 642. He "failed to keep the clients advised of developments in the case, including settlement negotiations, and failed to review settlement documents with the clients or to

explain to them the import of such documents." *Id.*

The Nebraska Supreme Court deemed the referee's findings "final and conclusive." *Id.* at 643. The evidence established that Rickabaugh "handled legal matters which he knew or should have known he was not competent to handle, ... failed to keep his clients informed of the progress of the pending matters and negotiated and entered into a settlement agreement on behalf of the clients without the clients' knowledge." *Id.* at 644.

In regard to Count II, the referee found that Rickabaugh "created fictitious pleadings and forged a judge's signature in an attempt to persuade Davis that [he] had filed a lawsuit and obtained a judgment in favor of one of Davis' companies against another company." *Id.* at 642. The Nebraska Supreme Court stated that Rickabaugh "knowingly made false statements of fact by representing to his client that he had filed a lawsuit and gained a favorable judgment on behalf of the client. In perpetrating this falsehood, [Rickabaugh] went so far as to create fictitious pleadings and to forge the signature of a judge." *Id.* at 644.

The charges that Rickabaugh had violated numerous provisions of the disciplinary rules were supported by clear and convincing evidence. His conduct violated rules governing dishonesty, conduct adversely reflecting on fitness to practice, handling a matter an attorney is not competent to handle, handling a matter without adequate preparation, neglect, concealing or failing to disclose facts, and false statement. In addition, the court concluded that Rickabaugh violated the attorney's oath of office. *Id.* at 643. His mishandling of matters, "especially the forging of a judge's signature, amounted to conduct that was prejudicial to the administration of justice." *Id.* at 644.

On May 7, 2003, Rickabaugh's Iowa law license was suspended with no possibility of reinstatement for three years. Exhibit 33.

On September 22, 2000, plaintiffs filed an action in the Nebraska District Court for Douglas County, Case No. 998–199 ("Douglas County litigation"). The petition made two claims. In a claim denoted "negligence," plaintiffs alleged that Rickabaugh breached his duties to plaintiffs and failed to represent them properly in the union litigation. Plaintiffs alleged further:

> As a result of Rickabaugh's failure to vigorously and zealously represent the interests of the Plaintiffs, Plaintiffs continue to be bound by a collective bargaining agreement that place[s] significant restrictions on the Plaintiffs' ability to continue their business operations and ability to generate income.... Plaintiffs have lost income in a yet undetermined amount in that Plaintiffs have not been able to engage in business in and around the greater Omaha metropolitan area and continue to be bound to a collective bargaining agreement that limits their business operations.

Exhibit 16, ¶¶ 23, 24.

In a claim denoted "breach of contract," plaintiffs alleged that Rickabaugh failed to perform the agreement entered into in settlement of their claim against Rickabaugh for attorney malpractice. Rickabaugh had agreed, among other things, to "provide a $250,000.00 life insurance policy" naming Davis and Mutum as beneficiaries. *Id.* at ¶ 26(e).

Rickabaugh represented himself in the Douglas County litigation. On or about October 30, 2000, he filed an answer denying the material allegations of the complaint.

On February 14, 2003, plaintiffs filed a motion for summary judgment in the Douglas County proceeding. Hearing on the motion was set for April 22, 2003. On the day of the hearing, plaintiffs filed an amended petition adding a claim denoted "fraudulent misrepresentation." Plaintiffs made the following new allegations:

26. Rickabaugh made false and fraudulent misrepresentations to the Plaintiffs in that Rickabaugh represented that certain actions had taken place in the proceeding before the United States District Court for the District of Nebraska, represented that he had taken certain action on behalf of the Plaintiffs, represented that he would protect, restore and indemnify the Plaintiffs, represented that he had filed a lawsuit against Upland Construction Company, and represented that he had obtained a judgment, all of which are further described above.

27. Rickabaugh knew his statements were false and fraudulent, knew the Plaintiffs would rely on the same and knew that they could be harmed by said reliance. Notwithstanding this knowledge, Rickabaugh made the false and fraudulent representations to the detriment of the Plaintiffs.

28. As a result of Rickabaugh's false and fraudulent representations, Plaintiffs have been harmed in a yet undetermined amount of money.

Exhibit 18 at 6.

Rickabaugh did not appear for the hearing on the motion for summary judgment. The Nebraska District Court for Douglas County issued an order in plaintiffs' favor on April 29, 2003. Notwithstanding the timing of the filing of the amended petition, the Nebraska court ordered that judgment be entered against Rickabaugh "under the first, second and third causes of action set forth in Plaintiff's Amended Petition." The court identified these damages:

14. Plaintiffs have incurred $20,770.00 in legal fees, as a result of seeking to correct errors arising out of the afore-referenced union case, litigating this matter, correcting errors to estate planning documents prepared by Defendant and initiating litigation against Upland Construction Co. Said amount of fees reflects the net amount paid by Plaintiffs after a $1,000.00 contribution by Defendant.

15. Pursuant to the Settlement Agreement executed by Defendant for the benefit of the Plaintiffs, Defendant agreed to secure a term life insurance policy in the amount of $250,000.00 and pay all premiums thereon, listing the beneficiaries as Randall C. Davis and David E. Mutum. No insurance was ever purchased.

16. Defendant is also liable for damages arising from lost profits to the Plaintiffs as a result of the judgment entered against them in the union case, which judgment prohibits them from certain participation in steel erection work up through the middle of 2004. The amount of lost profits from the time period from 1999 through 2004 is $1,239,582.54.

Exhibit 21 at 4.

The dollar figures of $1,239,582.54 for lost profits, $250,000.00 in life insurance, and $20,770.00 in legal fees total $1,510,352.54, the amount of the Nebraska District Court judgment. Rickabaugh did not appeal the order of judgment.

Rickabaugh eventually repaid Davis and Mutum the balance of $25,000 that they were required to pay to settle the union litigation. He had not billed Davis and Mutum for any attorney fees for legal work in the lawsuit. He paid the breach of contract damages caused by Davis and Mutum's inability to complete the Super Saver job. *See* Exhibit 13 (letter from Lueder Construction Company). After entry of the state court judgment, Rickabaugh made payments of $583 twice a month from November 2003 through August 2004. He missed one payment during that period. In January 2004, Rickabaugh took a distribution from his 401(k) plan and used the money to pay Davis and Mutum about $12,000.00. From September 2004 to January 19, 2005, the date of Rickabaugh's Chapter 7 petition, plaintiffs garnished his wages in the amount of $483 twice a month.

On March 21, 2005, Davis and Mutum filed the complaint in this adversary proceeding to determine the dischargeability of the Douglas County Nebraska judgment. The complaint alleged that the judgment arose out of fraud and legal malpractice committed by Rickabaugh and prayed that the judgment debt be held nondischargeable under § 523(a). Complaint, ¶¶ 6, 21.

On April 19, 2006, plaintiffs filed a motion for summary judgment on the basis of issue preclusion. In the brief in support of their motion for summary judgment, plaintiffs identified two theories of nondischargeability, fraud under § 523(a)(2)(A) and fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4). The motion was denied.

### Discussion

■ Plaintiffs bear the burden of proving by a preponderance of the evidence that their debt should be held nondischargeable. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The exceptions to discharge under 11 U.S.C. § 523(a) must be strictly construed in favor of the debtor. *Geiger v. Kawaauhau (In re Geiger),* 113 F.3d 848, 853 (8th Cir.1997), *aff'd,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *Barclays American/Business Credit, Inc. v. Long*

*(In re Long)*, 774 F.2d 875, 879 (8th Cir. 1985).

■ The court first addresses plaintiffs' claim under § 523(a)(4), that Rickabaugh's debt is for fraud or defalcation while acting in a fiduciary capacity. Whether a debtor has acted in a fiduciary capacity within the meaning of § 523(a)(4) is a matter of federal law. *Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir.1997). "The fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt." *Id.* The fiduciary status necessary for purposes of § 523(a)(4) is "more narrowly defined than that under the general common law [and] the broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable." *Jafarpour v. Shahrokhi (In re Shahrokhi)*, 266 B.R. 702, 707 (8th Cir. BAP 2001); *see also* 4 Collier on Bankruptcy ¶ 523.10[1][d] (15th ed. rev.2006) (discussing narrow construction of "fiduciary" under § 523(a)(4) compared with state law).

■ Plaintiffs argue that Rickabaugh's conduct falls within § 523(a)(4) because of the fiduciary duty an attorney owes his client. In some circumstances, an attorney's conduct with relation to his client may constitute action in a "fiduciary capacity" within the scope of § 523(a)(4). In *In re Cochrane*, the Eighth Circuit stated, "In general, an attorney-client relationship is the type of relationship for which the attorney's breach of fiduciary duties to the client may give rise to a finding of a 'defalcation' within the meaning of § 523(a)(4)." 124 F.3d at 984. *See also The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir.1999) (attorney-client relationship constitutes fiduciary relationship under § 523(a)(4), following *Cochrane* ).

In the *Cochrane* case, the debtor was an attorney who had represented partners in a multimillion dollar real estate foreclosure sale. In the transaction, the attorney kept for himself a share of the property that his clients had expected to hold and failed to disclose his interest in another purchasing entity. The debtor breached his fiduciary duties by failing to disclose his interest in the corporate purchaser and "by usurping Tudor Oaks's expected 20% interest in the real estate." *In re Cochrane*, 124 F.3d at 984. Applying § 523(a)(4), the court defined "defalcation" as—

> the misappropriation of trust funds or money held in any fiduciary capacity [or] the failure to properly account for such funds [including] the innocent default of a fiduciary who fails to account fully for money received.

*Id.* (quoting *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir.1996)).

■ If Rickabaugh had been entrusted with property, any debt arising from fraud or defalcation with respect to such property would be nondischargeable under § 523(a)(4). *Anderson v. Ingeneri (In re Ingeneri)*, 321 B.R. 601, 606 (Bankr.D.Me. 2005). Davis and Mutum have not made such a claim. A debt arising from an attorney's professional negligence does not come within § 523(a)(4) solely by reason of the attorney's fiduciary duty to the client. *In re Hayes*, 183 F.3d at 170 n. 4; *In re Ingeneri*, 321 B.R. at 604–05; *Metcalfe v. Waters (In re Waters)*, 239 B.R. 893, 904 (Bankr.W.D.Tenn.1999). Plaintiffs' claim for fraud should be analyzed under § 523(a)(2). *In re Ingeneri*, 321 B.R. at 606.

■ Section 523(a)(2)(A) of the Bankruptcy Code excepts from a Chapter 7 debtor's discharge "any debt ... for mon-

ey, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud...." To establish fraud for purposes of § 523(a)(2)(A), plaintiffs must prove the following elements by a preponderance of the evidence:

1. The debtor made a false representation.

2. The debtor knew the representation was false at the time it was made.

3. The representation was deliberately made for the purpose of deceiving the creditor.

4. The creditor justifiably relied on the representation.

5. The creditor sustained the alleged loss as the proximate result of the representation having been made.

*Burt v. Maurer (In re Maurer)*, 256 B.R. 495, 500 (8th Cir. BAP 2000). At trial, plaintiffs renewed their argument that at least some of the elements of fraud have been established by the preclusive effect of prior court decisions.

 In the attorney disciplinary proceeding, the Nebraska Supreme Court stated that Rickabaugh "knowingly made false statements of fact by representing to his client that he had filed a lawsuit and gained a favorable judgment on behalf of the client. In perpetrating this falsehood, [Rickabaugh] went so far as to create fictitious pleadings and to forge the signature of a judge." *State of Nebraska v. Rickabaugh*, 647 N.W.2d at 644. These findings establish, as to the claim stemming from the Upland collection litigation, that Rickabaugh knowingly made false statements with the intent to deceive the plaintiffs. The Nebraska Supreme Court made no findings, however, regarding plaintiffs' reliance or regarding damages that plaintiffs may have incurred as a result of the false representations.

As to the Douglas County litigation, Rickabaugh argued that the court's order of judgment should not have preclusive effect, because he was not afforded due process in that proceeding. Plaintiffs added a claim for fraud in an amended petition filed on the same day as the hearing on the motion for summary judgment. Rickabaugh says that he was not served with the amended petition and did not have an opportunity to respond to· it before the Nebraska court entered judgment against him. Nevertheless, he did not appeal the order of judgment.

 Federal courts must give the same full faith and credit to state court judgments as they would have in the courts of the state from which the judgments were taken. 28 U.S.C. § 1738; *Gouveia v. Tazbir*, 37 F.3d 295, 300 (7th Cir.1994). A final, valid judgment is subject only to jurisdictional challenges, not collateral attack, even if the deciding court made a mistake. Error is to be corrected by appeal. *Spartan Mills v. Bank of America Illinois*, 112 F.3d 1251, 1255 (4th Cir.1997). Nebraska courts would apply the same finality principles to their own decisions:

A judgment is not subject to collateral attack unless it is void. A judgment, even if erroneous, cannot be collaterally assailed. When a judgment is attacked in a way other than by proceeding in the original action to have it vacated, reversed, or modified, or by a proceeding in equity to prevent its enforcement, the attack is a "collateral attack."

*State of Nebraska v. Wessels*, 232 Neb. 56, 439 N.W.2d 484, 485–86 (1989).

This court need not determine whether Rickabaugh's due process claim is sufficient to permit a collateral attack on the judgment. The Douglas County decision did little more in establishing the elements

of plaintiffs' § 523 claims than did the attorney disciplinary proceeding.

In the Douglas County litigation, plaintiffs made claims for negligence, breach of contract, and fraud. Plaintiffs alleged that Rickabaugh made false representations in connection with the union litigation and the Upland Construction collection matter. Exhibit 18, ¶ 26. The Nebraska District Court for Douglas County concluded that Rickabaugh "committed fraud against Plaintiffs in intentionally misrepresenting facts upon which the Plaintiffs relied as set forth in Plaintiffs' Second Cause of Action." Exhibit 21, ¶ 17. The court's findings are in paragraphs 1 through 16 and include the following:

> Defendant was also asked by Plaintiffs to prosecute a collection proceeding against Upland Construction Co. No lawsuit was filed by Defendant on behalf of the Plaintiffs. However, Defendant represented to Plaintiffs that a lawsuit had been filed and produced "pleadings," which in fact were not authentic and which contained signatures of purported judges. Plaintiff Davis asked the Clerk of the Court in Pottawattamie County about the authenticity of the "pleadings" and "signature" and was advised that the case was not on file with the Court and the signature was not that of a judge with the Court.

Exhibit 21, ¶ 10. This court construes paragraph 10 as a finding that Rickabaugh made knowingly false statements with the intent to deceive in connection with the Upland Construction matter. The court cannot construe any other part of the Nebraska decision as a specific finding that Rickabaugh made knowingly false statements with the intent to deceive in connection with the union litigation. Therefore, this court concludes that the ruling on plaintiffs' fraud claim was based on the Upland Construction matter. The Nebraska court did not discuss whether plaintiffs' reliance on Rickabaugh's representations was justifiable. *See Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (standard of reliance required under § 523(a)(2)(A)). The court did not identify particular damages which resulted from the fraud.

The Nebraska court decisions established that Rickabaugh knowingly made false representations in connection with the Upland Construction matter. He intended plaintiffs to believe he had filed a collection action and that he had obtained judgment in their favor. At trial, however, plaintiffs did not prove that they justifiably relied on these representations to their detriment. When Davis received the supposed judgment document in the mail, he noticed that the envelope "didn't come from the right place." He called the courthouse and learned that the document was a falsification. Rickabaugh did not bill plaintiffs for legal fees for this matter. Plaintiffs hired other counsel to file an action against Upland. The evidence did not show that Rickabaugh's false representation had any effect on the outcome of the Upland lawsuit. Plaintiffs did not prove that they sustained damages as the proximate result of Rickabaugh's false representations in connection with the Upland matter.

 Plaintiffs' only remaining claim is that Rickabaugh made false representations in connection with the union litigation. As an initial matter, Rickabaugh argues that § 523(a)(2)(A) is not applicable to this case because he obtained nothing from the settlement of the union litigation. Section 523(a)(2)(A) excepts from discharge any debt for money, property, services or credit "to the extent obtained" by fraud. The court agrees that the statute requires the creditor to demonstrate first that the debtor obtained specific money or

property by fraud. In *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), the Court ruled that nondischargeable debt includes punitive damages as well as compensatory damages for fraud. "Once it is established that specific money or property has been obtained by fraud, … 'any debt' arising therefrom is excepted from discharge." *Id.,* 523 U.S. at 218, 118 S.Ct. at 1216. *See also Rose v. Lauer (In re Lauer),* 371 F.3d 406, 413 (8th Cir.2004) (finding debtor obtained "property," bringing claim "squarely within" § 523(a)(2)(A)). Section 523(a)(2)(A) unambiguously contains a threshold requirement that something of value be transferred from the creditor to the debtor. *Fledderman v. Glunk (In re Glunk),* 343 B.R. 754, 758 (Bankr.E.D.Pa. 2006); *cf. Hanft v. Church (In re Hanft),* 315 B.R. 617, 622 (S.D.Fla.2002) (medical malpractice judgment "traceable to" fraudulent representation was § 523(a)(2)(A)), *aff'd,* 73 Fed.Appx. 387 (11th Cir.2003).

■ Plaintiffs contend that Rickabaugh obtained settlement of their claim for his legal malpractice through false representations. This assertion is sufficient to find that plaintiffs have stated a claim under § 523(a)(2)(A). The first element that plaintiffs must prove is that Rickabaugh made a false representation.

■ When Davis and Mutum first agreed to settle their malpractice claim against Rickabaugh, he had led them to believe that the dollar amount needed to settle the union litigation was only $31,000. Rickabaugh did not disclose that the amount required was actually $63,000. Silence regarding a material fact can constitute a false statement for purposes of § 523(a)(2)(A). *Matter of Van Horne,* 823 F.2d 1285, 1288 (8th Cir.1987). Before executing the settlement with the union, plaintiffs learned of the correct amount from attorney Weinberg, who then assisted them in making a new agreement regarding Rickabaugh's malpractice. Therefore, Rickabaugh did not obtain the malpractice settlement agreement through deception as to the amount to be paid the union.

The evidence shows also that plaintiffs knew the other terms of settlement with the union when they entered into the malpractice settlement agreement. Attorney Weinberg reviewed the union settlement documents with them. Plaintiffs knew they would be required to enter into a new collective bargaining agreement with the union. They knew also that the union settlement would not allow the Super Saver project to go forward as a non-union job. The malpractice settlement contemplated that Rickabaugh would pay for legal efforts to undo the effects of the union settlement and that he would pay the damages for breach of the Super Saver contract. Exhibit 11.

Therefore, although plaintiffs were not kept informed of the status of the litigation and did not know the contents of the union settlement agreement until shortly before the settlement date, they did know the terms of the agreement prior to executing the documents. They did not bind themselves to the agreement in reliance on a false representation of the terms of the agreement.

■ Plaintiffs relied on Rickabaugh's admission of malpractice and his promise to pay damages as set out in the malpractice settlement agreement, Exhibit 11. A promise is a representation of intent to perform that which is promised. A breach of the promise, however, does not establish that the representation was false. *DCFS Trust v. Goldstein (In re Goldstein),* 345 B.R. 412, 422 (Bankr. D.Mass.2006). To establish that Rickabaugh's promise to pay their damages was

a false representation, plaintiffs would have to prove that, at the time he made the promise, Rickabaugh had no intent to honor it. *In re Goldstein,* 345 B.R. at 422. The evidence shows that Rickabaugh performed his agreement in a number of respects. He paid $38,000 at the time of the settlement with the union and the $25,000 balance at a later time. He gave plaintiffs a mortgage on his property. He paid the breach of contract damages relating to the Super Saver project. He paid $1,000 toward plaintiffs' attorney fees. Accordingly, plaintiffs have not shown that Rickabaugh's promise to pay damages in settlement of his malpractice was a false representation.

▮ Davis and Mutum relied on Rickabaugh to represent them competently, just as one relies on a medical doctor to be competent. Rickabaugh failed to do so. Plaintiffs did not prove that Rickabaugh's conduct was done with the actual intent to cause injury necessary to sustain a claim for willful and malicious injury. Damages attributable to negligence are dischargeable in bankruptcy. *See Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (medical malpractice judgment attributable to negligent or reckless conduct not within scope of § 523(a)(6)). To the extent that the damages awarded in the Douglas County judgment are attributable to ordinary breach of contract, the debt is dischargeable. *Integrated Practice Management, Inc. v. Olson (In re Olson),* 325 B.R. 791, 801 (Bankr.N.D.Iowa 2005) (citing *Sandak v. Dobrayel (In re Dobrayel),* 287 B.R. 3, 24–25 (Bankr.S.D.N.Y.2002)). Plaintiffs have not shown that their claim was proximately caused by justifiable reliance on an intentionally false representation by Rickabaugh.

IT IS ORDERED that the complaint is dismissed. Judgment shall enter accordingly.